[No. S056765. July 10, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD RAY PARSON, Defendant and Appellant.

336

COUNSEL

Pamala Sayasane, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant

Attorney General, Eric L. Christoffersen and Charles A. French, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BAXTER, J.**—Defendant Richard Ray Parson was convicted by a jury of one count of first degree murder (Pen. Code, § 187, subd. (a)),[1] one count of first degree robbery (§ 211), and one count of first degree burglary (§ 459). The jury found true the allegation that defendant personally used a deadly and dangerous weapon in the commission of the murder (§ 12022, subd. (b)), as well as the special circumstances that the murder was committed while defendant was engaged in robbery and burglary (§ 190.2, subd. (a)(17)). At a bench trial, the court found true five prior conviction and prior prison term allegations for purposes of sentence enhancement. At the penalty phase, the jury returned a verdict of death. Appeal to this court is automatic. (§ 1239, subd. (b).)

As we explain below, we find no prejudicial error at the guilt or penalty phase of defendant's trial. We therefore affirm the judgment in its entirety.

### I. FACTS

#### A. *The Guilt Phase*

Theresa Schmiedt was a 59-year-old convalescent hospital nurse who lived by herself in an apartment complex in Sacramento, California. On the morning of January 2, 1994, she was found murdered in her living room. She had died from blunt craniocerebral trauma caused by multiple hammer blows to her head.

#### 1. *The Prosecution Case*

Defendant and Theresa Schmiedt knew each other before the murder. According to the prosecution, defendant was a longtime drug abuser who sometimes spent as much as $500 a day on drugs, and the need to support his drug habit motivated him to kill Schmiedt. The prosecution's case included the testimony of Schmiedt's neighbors and defendant's ex-wife, forensic and other physical evidence, and evidence of defendant's own statements and admissions.

---

[1] All statutory references are to this code unless otherwise indicated.

Around 8:30 p.m. on January 1, 1994, Schmiedt spoke with her daughter, Mary Pendergrass, by telephone. Schmiedt expressed fear during the telephone call and spoke of calling the police because " '[t]he crazy man was on his way over with a large sum of money.' " Although Pendergrass was not sure that Schmiedt mentioned defendant by name, she understood her mother to be talking about Richard Parson.

Around 10:00 o'clock that same night, Patricia Clark was in her apartment unit directly below Schmiedt's unit, when she heard Schmiedt allow a male visitor in. Once the visitor was inside, Clark heard footsteps in Schmiedt's kitchen area and subsequently heard "a lot of fast, shuffling-type footsteps" sounding like dancing. About 15 or 20 minutes after the visitor's arrival, Clark heard the springs squeaking in Schmiedt's recliner chair and then a single "thump" sound.[2] After the thump, Clark heard no other noises in Schmiedt's apartment. As far as Clark could tell, Schmiedt was not in distress, and nothing was wrong upstairs.

When Schmiedt did not report to work the next day, her employer asked Jennie Treiger, the assistant manager at the apartment complex, to check in on Schmiedt. Treiger entered Schmiedt's unit and found her body curled up in a fetal position in a recliner chair, which had been tipped backward. There were bloodstains on the nurse's uniform Schmiedt was wearing, and her hair was matted with blood.

Dr. Gregory Reiber, who performed the autopsy, testified that Schmiedt died from blunt craniocerebral trauma caused by 18 or more blows to her head from an instrument such as a hammer. The area of the skull surrounding her left ear had been shattered open, and the skull had been fragmented into multiple pieces. The damage had left her brain tissue exposed, her left ear nearly severed, and her lower jaw fractured. Dr. Reiber also found scraping and bruising around the front side of Schmiedt's neck, a fractured hyoid bone, and petechial hemorrhaging in her right eye, which were consistent with manual strangulation. Both of Schmiedt's forearms were fractured and extensively bruised, indicating she attempted to defend against the blows to her head.

Bank cameras recorded defendant's presence at various automated teller machines (ATM's) in the early morning hours of January 2, 1994, as Sherri

---

[2] Another neighbor also reported hearing the thump sound that evening.

Knowles and Christina Quintana attempted to withdraw money from Schmiedt's accounts using her ATM card. Three withdrawals, each in the amount of $40, were made at a First Interstate Bank ATM in Stockton. Several withdrawal attempts were made at a Wells Fargo Bank ATM in Stockton, but only one successful withdrawal of $100 occurred. Other unsuccessful withdrawal attempts were made at a Bank of the West ATM. The following day, additional withdrawals totaling $260 were made from Schmiedt's Wells Fargo Bank account. On January 3, 1994, defendant was with his friend, Jeanne Maccrone, when he attempted to cash a $500 check from Schmiedt's account.

On the evening of January 4, 1994, defendant checked into the National 9 Motel in Gilroy, California. The next day, defendant's car remained in the motel parking lot, but he had disappeared without checking out or paying to extend his stay. The motel manager called the Gilroy police, whose arrival at the motel was followed by that of county and federal authorities. Various items of evidence were seized from defendant's motel room, including the victim's purse and her credit cards, driver's license, checkbook, and checks, as well as defendant's clothing and other personal effects, a hammer, an athletic bag, marijuana, a syringe, heroin, and sixth-tenths of a gram of methamphetamine. The hammer had traces of human blood, and defendant's ex-wife, Josephine Parson, testified the hammer looked like the one she earlier placed in a toolbox in defendant's car. A search of defendant's car produced a suitcase that contained miscellaneous legal papers, some bearing his name.

At Schmiedt's apartment, prints matching defendant's fingerprints were found on a coffee cup, a Dairy Queen cup, and a wallboard. Prints matching his fingerprints also appeared on a piece of paper from a yellow legal pad. Human blood was found in the kitchen sink and on the living room wall.

On January 7, 1994, an arrest warrant for defendant was issued in Sacramento County. On January 10, United States Marshals placed him on their list of "top 15 most-wanted fugitives."

Around midnight on January 12, 1994, defendant telephoned the home of Lawanna Tomason, a female acquaintance, and he asked to speak with their mutual friend, Jeanne Maccrone. Tomason thought defendant sounded nervous. Before Tomason called Maccrone to the phone, defendant told her, "Remember what I said I was going to do? . . . Well, I did it, but I lost

everything in the process." He then asked Tomason if the police had been by. When she said no, he replied, "[w]ell, they'll be coming by." Tomason had no idea what defendant was talking about, but assumed he was referring to a bank robbery because he mentioned in a prior conversation that he would repay her and Maccrone for their kindness.

On January 17, 1994, defendant was arrested in Vancouver, Washington. He appeared to be on drugs at the time. After his arrest, defendant telephoned his ex-wife, Josephine Parson. During that call, she asked defendant what happened. He replied, "A lot of madness" and "I guess they'll put me in the electric chair." When she asked defendant if what happened was "[b]ecause she wouldn't give you the money," he responded, "[s]omething like that."

On April 5, 1994, Josephine Parson visited defendant at the Sacramento County jail. During their tape-recorded conversation, she told him she would tell the truth regarding her knowledge of the case. Defendant replied, "[t]he truth ain't going to work in this case."

While incarcerated in the Sacramento County jail, defendant referred to his murder of a woman in a note he sent to fellow inmate Tyler Jameson: "I understand your rage in being fucked over by your lady, my situation was of a similiar [*sic*] nature except the bitch tried to burn me for not smoking her ex-husband! When I went to get my money she got crazy + I had to shut her up, a robbery became a 187 + here I am in this madness—Anyway, thanks for helping with the bond money to Jay for my friend, I'll be repaying you as soon as possible—Rip this kite up + flush." The note indicated that "Jay" was a reference to Josephine Parson.

### 2. *The Defense Case*

The defense conceded that defendant rendered the blows that killed Schmiedt, but contended he did not intend to kill her when he entered her apartment. Defendant had been using methamphetamine extensively during this time period. He went to Schmiedt's apartment to charm or con money out of her in order to support his drug habit, and he entered her home as an invited guest. While there, he caught Schmiedt looking at his list of personal contacts that he had kept in his wallet, and he became convinced she was working with law enforcement to apprehend him. His drug-induced paranoia caused him to become enraged and beat her uncontrollably with the hammer. After Schmiedt died, defendant panicked and fled the scene, taking her purse with him.

B. *The Penalty Phase*

1. *The Prosecution Case*

The prosecution relied on the circumstances of the underlying murder in advocating for the death penalty.

The prosecution also presented evidence of the following 10 prior felony convictions: (1) an October 1983 federal conviction for conspiracy to introduce a narcotic drug into a prison; (2) an October 1983 federal conviction for using a communication facility to commit a felony; (3) a May 1977 California conviction for receiving stolen property; (4) a May 1977 California forgery conviction; (5) a June 1970 federal conviction for robbing a bank in Oregon; (6) a June 1970 federal firearm conviction related to the Oregon bank robbery; (7) a federal conviction for robbery of a Washington bank in 1969 by means of armed assault; (8) a February 1968 Alaska forgery conviction; (9) a February 1968 Alaska conviction for passing a forged check; and (10) a September 1967 federal conviction for interstate transportation of a stolen vehicle. Additionally, the prosecution presented evidence that defendant previously committed two robberies involving the express or implied use of force or violence or the threat of force or violence.

Schmiedt's son, Theodore Brame, told the jury that his mother raised three children by herself and that she cared for many sick and dying people at the convalescent hospital where she worked. He experienced uncontrollable grief upon learning of his mother's death.

2. *The Defense Case*

Family members described defendant's family as one that moved around a lot and did not have much money. Defendant helped out by doing odd jobs for farmers. Defendant's parents drank heavily, fought with each other, and occasionally beat him.

Defendant's father explained that defendant was a "normal boy" who did not get into any real trouble until adulthood. His mother gave a similar account, indicating that defendant was an adult when he became involved in blackmail, bank robberies, and parole violations. Although defendant's father did not want to see him executed, his mother said she loved him but it would not bother her and she would be relieved if he received a death sentence. Defendant's two adult daughters, his siblings, and his friends testified they did not want to lose him to execution.

Clinical psychologist Larry Nicholas reviewed defendant's neuropsychological evaluation and criminal records. He also conducted several interviews

with defendant and reviewed videotaped interviews of his family members. His investigation disclosed that defendant's family was highly dysfunctional, that his parents had quick tempers, and that discipline in the family was harsh. The family experienced suicides, suicide attempts, and sexual victimization. Defendant was a difficult child, and his mother often locked him in a closet for hours at a time.

Neuropsychologist John Wicks administered a battery of tests on defendant and concluded defendant was in the low or dull normal range of intelligence. Defendant had mild to moderate dementia, perhaps resulting from premature aging, cardiovascular disease, or excessive drug and alcohol use. Dr. Wicks also assumed, based on defendant's history, that he had an antisocial personality.

Psychiatrist Albert Globus found evidence of longstanding brain damage to both of defendant's temporal lobes and probable damage to the frontal lobes. Dr. Globus concluded the damage impaired defendant's social judgment or cognitive ability, as well as his memory, at the time of the murder. He also believed that, when the murder occurred, defendant was under the influence of alcohol and methamphetamine and suffering from an organic mental defect. Although Dr. Globus estimated defendant's IQ at slightly above 100, he believed defendant had a reduced capacity to control his impulses of rage the night he killed Schmiedt.

Defendant gave the following allocution statement: "Members of the jury, I killed Theresa Schmiedt. I had no intention to kill this victim when I entered her apartment. And I apologize to both the victim's family and to my family for the pain I have caused."

## II. DISCUSSION

### A. *Pretrial and Guilt Phase Issues*

#### 1. *Denial of Motion to Suppress*

The trial court denied defendant's pretrial motion to suppress evidence seized from his Gilroy motel room and vehicle. Defendant contends this ruling was erroneous and deprived him of his state and federal constitutional rights to a fair trial, a meaningful defense, effective assistance of counsel, a fair determination of guilt and penalty, reasonable access to the courts, equal protection, and due process of the law.

a. *Background Facts*

On the evening of January 4, 1994, defendant checked into the National 9 Motel in Gilroy, California. He paid for one night's lodging but advised the manager he might stay another night or two.

On January 5, 1994, defendant disappeared without paying for an additional night's stay or checking out by the 11:00 a.m. deadline. Although defendant's car was in the motel parking lot, there was no answer when the maid and the manager periodically knocked on defendant's motel room door and telephoned the room during the day. Between 5:30 and 6:00 p.m., the motel comanager (the manager's husband) checked the motel room. Finding the front door chained from the inside, the comanager went around the back and saw that the bathroom window was open. A damaged window screen was lying on the ground, along with a man's jacket. The comanager entered the room through the open window, and told his wife to call police after he found no one inside.

At approximately 6:00 o'clock that evening, Gilroy Police Detective Sergeant Daniel Carumrine arrived at the motel. Between 10:00 and 11:00 p.m., federal Deputy Marshals David Gump and Jeff Jones arrived at the scene with a federal arrest warrant for defendant based on a parole violation. Detectives Stan Reed and Darrell Edwards of the Sacramento County Sheriff's Department also arrived after receiving Deputy Marshal Gump's report of defendant's possible presence at the motel. By that time, the detectives regarded defendant as a prime suspect in Schmiedt's murder based on information that he went to her apartment the night she was killed (Jan. 1, 1994) and that he was involved in attempts to use her ATM card in the hours and days following the murder (Jan. 2 and 3, 1994).

The comanager informed the authorities that he had entered defendant's motel room and did not find defendant inside. Because the rear of the motel had not been under surveillance after the comanager's inspection, the authorities decided to enter the room to check for defendant and serve the arrest warrant if possible. Edwards and Jones covered the bathroom window while Reed, Carumrine, and Gump stayed at the front door. Reed knocked and announced their presence and their purpose to arrest defendant pursuant to the arrest warrant. Hearing no response, the authorities entered the room with a passkey provided by the motel manager.

Edwards walked directly to the bathroom to confirm he had been standing outside of defendant's room. Defendant was not present, and the bed looked as if no one had slept in it. Various personal items had been left in the room, including clothes, toiletries, a pair of glasses, and a newspaper. Edwards and

Reed saw a woman's purse containing Schmiedt's driver's license and credit cards. They also saw an unzipped black athletic bag on the floor and, without opening it further, observed a hammer inside. Although Reed believed that defendant had abandoned the motel room, he decided to seek guidance from a district attorney regarding the legality of a search.[3]

Reed telephoned the Sacramento County District Attorney's Office and spoke with Deputy District Attorney Steve Secrest. As the need for a search warrant was being considered, the authorities exited the motel room and secured it. Secrest ultimately determined that the room was probably abandoned, but that a search warrant should be obtained due to the seriousness of the case. Reed and Edwards then prepared a search warrant affidavit and presented it to a judge the next morning (on Jan. 6, 1994).

After obtaining a warrant, Reed and Edwards returned to the motel and conducted a search of the room and defendant's car. Evidence seized from the room included the victim's purse, which contained her identification, credit and debit cards, checkbook, and checks. Also seized were items belonging to defendant, including clothing, eyeglasses, toiletries, the athletic bag with the hammer, marijuana, a syringe, heroin, and sixth-tenths of a gram of methamphetamine. Evidence seized from the car included a suitcase containing miscellaneous legal papers.

Before trial, defendant moved to suppress the seized evidence. (§ 1538.5.) After hearing from both sides, the trial court expressed its view that a search warrant might not have been necessary given the facts included in the search warrant affidavit. The court denied suppression, specifically finding as a factual matter that defendant had abandoned the motel room. It additionally agreed with the prosecution that the authorities properly entered the room pursuant to the arrest warrant and the exigent circumstances doctrine, and that the evidence was admissible under the plain view, independent source, and inevitable discovery doctrines. The court, however, did not agree that defendant lacked standing to contest the search of the victim's purse found in the motel room.

b. *Analysis*

Defendant essentially claims that the initial warrantless entry of county and federal authorities into the motel room was unlawful, that the decision of

---

[3] Gilroy Police Detective Sergeant Carumrine testified that one or two officers were in the motel room for about an hour, but he acknowledged that was an "assumption" and that he "[did not] recall for sure." Detective Reed testified that Carumrine's time estimate was incorrect, and Detective Edwards likewise estimated they were in the room for 15 minutes before they left to obtain a search warrant.

Detectives Reed and Edwards to seek a search warrant was prompted by their observations during that initial illegal entry, and that use of such observations tainted the warrant-authorized room and car searches and invalidated the resulting seizure of evidence. According to defendant, the trial court's denial of his suppression motion was erroneous and violated his state and federal constitutional rights. We disagree for the reasons below.

■ In ruling on a motion to suppress, the trial court is charged with (1) finding the historical facts; (2) selecting the applicable rule of law; and (3) applying the latter to the former to determine whether or not the rule of law as applied to the established facts has been violated. (*People v. Ayala* (2000) 24 Cal.4th 243, 279 [99 Cal.Rptr.2d 532, 6 P.3d 193].) On appeal, we review the trial court's resolution of the first inquiry, which involves questions of fact, under the deferential substantial-evidence standard, but subject the second and third inquiries to independent review. (*Ibid.*; see also *People v. Weaver* (2001) 26 Cal.4th 876, 924 [111 Cal.Rptr.2d 2, 29 P.3d 103].)

■ The Fourth Amendment to the federal Constitution guarantees against unreasonable searches and seizures by law enforcement and other government officials.[4] This protection extends to motel and hotel rooms in which the occupant has a reasonable expectation of privacy. (*Stoner v. California* (1964) 376 U.S. 483, 490 [11 L.Ed.2d 856, 84 S.Ct. 889]; *People v. Bennett* (1998) 17 Cal.4th 373, 384 [70 Cal.Rptr.2d 850, 949 P.2d 947].) It has long been settled, however, that a warrantless search and seizure involving abandoned property is not unlawful, because a person has no reasonable expectation of privacy in such property. (*Abel v. United States* (1960) 362 U.S. 217, 241 [4 L.Ed.2d 668, 80 S.Ct. 683] [wastebasket contents in vacated hotel room]; *People v. Smith* (1966) 63 Cal.2d 779, 800–801 [48 Cal.Rptr. 382, 409 P.2d 222] [abandoned rental car]; *People v. Daggs* (2005) 133 Cal.App.4th 361, 365 [34 Cal.Rptr.3d 649] [abandoned cell phone].) Thus, "when a day-to-day room guest of a hotel or motel departs without any intention of occupying the room any longer and without making any arrangement for payment of his bill, an inference arises that he has abandoned his tenancy. . . . This is so even though the guest leaves some of his personal belongings behind." (*People v. Raine* (1967) 250 Cal.App.2d 517, 521 [58 Cal.Rptr. 753] [finding motel room search lawful even though it preceded the motel's daily checkout time]; see also *People v. Ingram* (1981) 122 Cal.App.3d 673, 677–678 [176 Cal.Rptr. 199]; *People v. Remiro* (1979) 89 Cal.App.3d 809, 834–835 [153 Cal.Rptr. 89].)

---

[4] In California, issues relating to the suppression of evidence derived from governmental searches and seizures are reviewed under federal constitutional standards. (*People v. Ayala* (2000) 23 Cal.4th 225, 254–255 [96 Cal.Rptr.2d 682, 1 P.3d 3].)

■ "[T]he intent to abandon is determined by objective factors, not the defendant's subjective intent. ' "Abandonment is primarily a question of intent, and intent may be inferred from words, acts, and other *objective* facts. [Citations.] Abandonment here is not meant in the strict property-right sense, but rests instead on whether the person so relinquished his interest in the property that he no longer retained a reasonable expectation of privacy in it at the time of the search." ' [Citations.]" (*People v. Daggs, supra,* 133 Cal.App.4th at pp. 365–366.) "The question whether property is abandoned is an issue of fact, and the court's finding must be upheld if supported by substantial evidence." (*Id.* at p. 365.)

Here, the evidence at the suppression hearing established that defendant left Sacramento in the hours after Theresa Schmiedt was murdered on January 1, 1994, and then headed to Stockton where he and others attempted to withdraw money from Schmiedt's bank accounts at various ATM's. On January 4, defendant paid for one night's lodging at the motel in Gilroy. Although he indicated to the motel manager that he might stay another night or two, he disappeared without paying for an additional night's stay or further communicating with the motel managers or employees. The comanager entered the room several hours after the 11:00 a.m. checkout time had passed, and only then after repeated attempts to make contact with defendant failed. The bed in the room looked as if no one had slept in it, and clothes and other personal items had been left behind. Although defendant's car was parked in front of the motel room, he apparently exited out the back through the bathroom window after locking the front door with the interior chain. A broken window screen and a jacket were found on the ground underneath the open window. Once defendant departed from the motel, he never contacted the motel manager about the room or the items he left behind. The next time anyone reported hearing from him was a week later (Jan. 12) when he called Lawanna Tomason from Bend, Oregon.

■ Viewed in the light most favorable to the trial court's ruling, this evidence amply demonstrated an intent on defendant's part to abandon the motel room and the items left behind. The circumstances were all objective indications that defendant, who fled Sacramento after Schmiedt's murder, had decided to surreptitiously leave the motel room and the Gilroy area in a hurry.

In disputing the abandonment finding, defendant points out that (1) he left his belongings and car at the motel; (2) the motel manager indicated that, at least for some time after the 11:00 a.m. checkout time had passed, she still considered him a guest because his car remained in the lot and the motel's policy was to allow a one-day grace period before confiscating a room and placing a guest's belongings in storage; and (3) even the detectives were not absolutely certain he had abandoned the room. We are not persuaded.

While the first circumstance arguably supports a finding that defendant intended to return to the motel, it is also entirely consistent with the trial court's contrary finding that he took flight and abandoned the premises in a rush. Likewise, the subjective beliefs of the motel manager and the detectives were not inconsistent with the court's finding of abandonment and fail to warrant reversal of that finding.

Relying on *U.S. v. Allen* (6th Cir. 1997) 106 F.3d 695, *U.S. v. Huffhines* (9th Cir. 1992) 967 F.2d 314, *U.S. v. Reyes* (8th Cir. 1990) 908 F.2d 281, and *U.S. v. Ramirez* (5th Cir. 1987) 810 F.2d 1338, defendant appears to argue that an abandonment may not be found where, as here, the motel manager did not retake physical possession of the motel room from the guest prior to the challenged search. We are not convinced.

*U.S. v. Allen, supra,* 106 F.3d 695, *U.S. v. Huffhines, supra,* 967 F.2d 314, and *U.S. v. Reyes, supra,* 908 F.2d 281, all addressed warrantless searches of rented property, but, strictly speaking, they did not purport to identify abandonment as the issue raised. Instead, these decisions essentially determined that a person has no reasonable expectation of privacy in a rented space after the rental period has expired, and that upon expiration of the rental period, the owner is entitled to retake control and physical possession of the rental property and consent to its search by the police. (*U.S. v. Allen, supra,* 106 F.3d at p. 699 [motel manager locked guest out of room]; *U.S. v. Huffhines, supra,* 967 F.2d at p. 318 [motel assistant manager repossessed room]; *U.S. v. Reyes, supra,* 908 F.2d at p. 286 [owner plugged lock of rented bus station locker]; *U.S. v. Ramirez, supra,* 810 F.2d at p. 1340 [manager entered hotel room to ready it for new occupants].) Although *U.S. v. Ramirez, supra,* 810 F.2d 1338, did characterize the hotel room in that case as "abandoned" when the defendants did not return to the room due to their lawful arrest (*id.* at p. 1340), its rationale for denying suppression was similar to that in the other three decisions (*id.* at p. 1341, fn. 3). Thus, while these authorities indicate there can be no legitimate expectation of privacy in a rented room after the paid occupancy period expires and the owner actually reasserts physical control over the room, they fall far short of holding or even suggesting that a motel room must be formally repossessed in order to be deemed abandoned.[5]

Moreover, as discussed, case law establishes that abandonment is primarily a question of the defendant's intent, as determined by objective factors such as the defendant's words and actions. (*People v. Daggs, supra,* 133

[5] Although the same facts might support a search under both an abandonment theory and a repossession and consent theory, the People did not advance the latter theory in the proceedings below and do not raise it here.

Cal.App.4th at pp. 365–366, and cases cited.) Logically, then, the question of abandonment should not necessarily turn on whether a motel's management elects to repossess.

In sum, the trial court's denial of the suppression motion, based on its finding of abandonment, reflected a correct application of the law and did not violate defendant's constitutional rights.[6]

### 2. *Failure to Instruct on Assault*

Defendant contends the trial court erroneously failed to instruct sua sponte on assault because there was substantial evidence showing the offense he committed was less than the charged robbery and burglary counts. The failure to so instruct, he claims, requires reversal of the robbery and burglary convictions, as well as the first degree murder conviction and special circumstances premised on robbery and burglary.

### a. *Background Facts*

The information charged defendant with first degree felony murder, robbery, and burglary, and alleged the special circumstances of robbery murder and burglary murder. According to the prosecution's theory of the case, defendant committed a burglary by entering Schmiedt's apartment with the intent to commit a robbery or theft in order to obtain money to feed his expensive drug and alcohol habit. Once inside the apartment, he robbed and killed Schmiedt during his commission of the robbery and burglary.

As relevant here, the court instructed the jury on the elements of robbery and burglary, but did not instruct on assault as a lesser included offense of robbery. The court also instructed, in conformity with CALJIC No. 4.21.1 (1992 new), that if there was evidence defendant was intoxicated at the time of the alleged crimes, the jury "should consider that fact in determining whether or not the defendant had [the requisite] specific intent or mental state" for the crimes of murder, manslaughter, burglary, or robbery.

### b. *Analysis*

■ In determining whether the trial court was required to instruct on assault, we are guided by the following legal principles. A trial court has a sua sponte obligation to instruct the jury on any uncharged offense that is lesser than, and included in, a greater charged offense, but only if there is

---

[6] In light of this conclusion, we need not and do not address whether the court's ruling may be upheld on other grounds.

substantial evidence supporting a jury determination that the defendant was in fact guilty only of the lesser offense. (*People v. Waidla* (2000) 22 Cal.4th 690, 733 [94 Cal.Rptr.2d 396, 996 P.2d 46]; *People v. Bacigalupo* (1991) 1 Cal.4th 103, 127 [2 Cal.Rptr.2d 335, 820 P.2d 559], vacated on other grounds in *Bacigalupo v. California* (1992) 506 U.S. 802 [121 L.Ed.2d 5, 113 S.Ct. 32]; see *People v. Breverman* (1998) 19 Cal.4th 142, 154–155 [77 Cal.Rptr.2d 870, 960 P.2d 1094].) An uncharged offense is included in a greater charged offense if *either* (1) the greater offense, as defined by statute, cannot be committed without also committing the lesser (the elements test), *or* (2) the language of the accusatory pleading encompasses all the elements of the lesser offense (the accusatory pleading test). (*People v. Wolcott* (1983) 34 Cal.3d 92, 98 [192 Cal.Rptr. 748, 665 P.2d 520]; *People v. Barrick* (1982) 33 Cal.3d 115, 133 [187 Cal.Rptr. 716, 654 P.2d 1243]; see *People v. Reed* (2006) 38 Cal.4th 1224, 1227–1228 [45 Cal.Rptr.3d 353, 137 P.3d 184].)

■ Under the elements test, a court determines whether, as a matter of law, the statutory definition of the greater offense necessarily includes the lesser offense. A robbery is "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force *or* fear." (§ 211, italics added.) An assault, however, is "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) Because a robbery can be committed strictly by means of fear, assault is not a lesser included offense of robbery under the elements test. (*People v. Wolcott, supra*, 34 Cal.3d at p. 100.)

■ Under the accusatory pleading test, a court reviews the accusatory pleading to determine whether the facts actually alleged include all of the elements of the uncharged lesser offense; if it does, then the latter is necessarily included in the former. (*People v. Reed, supra*, 38 Cal.4th at pp. 1227–1228.) Here, the pleadings accused defendant of a taking by force *and* fear. Analogizing to *People v. Barrick, supra*, 33 Cal.3d 115, which addressed the accusatory pleading test in the context of vehicle theft and joyriding, defendant contends that, because the robbery as charged was necessarily accompanied by force, it necessarily included the lesser offense of assault. Defendant may be understood to argue he was entitled to instructions on assault because the evidence supported a finding that when he entered Schmiedt's apartment and used force against her, he was so intoxicated he did not actually form or harbor the requisite intent for robbery, i.e., the intent to permanently deprive Schmiedt of her property.[7]

---

[7] Defendant also appears to argue there was significant evidence he *could not* form the requisite intent to steal due to intoxication. As of June 8, 1982, however, the law established that "evidence concerning an accused person's intoxication . . . shall not be admissible to show or negate capacity to form the particular purpose, intent, motive, malice aforethought,

In response to defendant's claim, the People rely on *People v. Wright* (1996) 52 Cal.App.4th 203 [59 Cal.Rptr.2d 316], which specifically held an assault is not necessarily included when a pleading alleges a robbery by force and fear. *Wright* reasoned that commission of a robbery by force is possible without necessarily committing an assault because the use of force may be actual or constructive, and may include the use of threat to induce fear, even without an attempt to apply force or the present ability for an assault. (52 Cal.App.4th at pp. 210–211.)

Even assuming that assault is a lesser included offense of robbery as charged here, the trial court was under no sua sponte obligation to instruct on assault if, in any event, there was no substantial evidence supporting a jury determination that the defendant was in fact guilty only of that offense. (See, e.g., *People v. Sakarias* (2000) 22 Cal.4th 596, 622, fn. 4 [94 Cal.Rptr.2d 17, 995 P.2d 152]; *People v. Bacigalupo, supra*, 1 Cal.4th at p. 127.) In making this determination, we turn to defendant's claim that he was so intoxicated when he went to Schmiedt's apartment that he did not form or harbor the specific intent to rob or steal from her.[8]

The sum and substance of the evidence relating to intoxication was as follows. Josephine Parson testified that defendant had "drugged a whole lot" ever since 1960 or 1970, and he could have been supporting a $500-a-day drug habit in 1993. Defendant ingested drugs and alcohol when he stayed with Josephine Parson beginning in November 1993 to sometime before Christmas 1993, and she believed he was on alcohol and/or drugs when he telephoned her on January 2, 1994 (the day after Schmiedt's murder), and again on January 17, 1994 (the date of defendant's arrest in Vancouver, Washington). Jeanne Maccrone and Lawanna Tomason testified that in November 1993, they drank alcohol with defendant. Maccrone also testified that on January 2, 1994, she saw defendant drinking a beer and thought he was drunk. Tomason testified she saw defendant on January 2 and he seemed fine, but on January 3, 1994, she heard defendant slurring his words and thought he might have been smoking marijuana. Detective Edwards and Deputy Marshal Gump testified that on January 6, 1994, they searched defendant's Gilroy motel room and found small amounts of methamphetamine and marijuana, and heroin paraphernalia. When defendant was arrested on January 17, 1994, he appeared to be under the influence of drugs.

---

knowledge, or other mental state required for the commission of the crime charged." (§ 25, subd. (a); see also § 22, subd. (a).)

[8] Although the trial court apparently found an evidentiary basis to support voluntary intoxication instructions, defendant acknowledges the People are entitled to an independent appellate determination of the sufficiency of the evidence of intoxication to warrant assault instructions. (See *People v. Frierson* (1979) 25 Cal.3d 142, 157 [158 Cal.Rptr. 281, 599 P.2d 587].)

Whether considered separately or together, the foregoing did not furnish substantial evidence to support a determination that defendant was under the influence of drugs or alcohol at the time he entered Schmiedt's apartment and used force against her. (*People v. Roldan* (2005) 35 Cal.4th 646, 716 [27 Cal.Rptr.3d 360, 110 P.3d 289] [evidence showing the defendant habitually used marijuana and was " 'ecstatic' " and on " 'cloud nine' " a few hours *after* the crime did not constitute substantial evidence that he was intoxicated or under the influence *at the time* of the crime]; *People v. Horton* (1995) 11 Cal.4th 1068, 1119 [47 Cal.Rptr.2d 516, 906 P.2d 478] [although testimony established the defendant had freebased cocaine the day *prior to* the commission of the crimes, there was no evidence showing he was intoxicated *at the time* the crimes occurred].) To the contrary, the evidence showed that defendant acted in accordance with a preconceived plan to rob or steal money from Schmiedt, that he successfully convinced her to let him into her apartment, and that he socialized with her until he decided to attack her with a hammer that he brought with him. On this record, the trial court had no sua sponte duty to instruct on the lesser offense of assault.

### 3. *Failure to Instruct on Theft*

Defendant contends that the trial court erred when it failed to instruct sua sponte on theft and on the definition of the term "steal" in connection with the elements required for burglary. This error, he claims, was prejudicial and denied him his state and federal constitutional right to present a defense and rights to a fair trial, effective assistance of counsel, reliable determinations of guilt and penalty, due process, and equal protection of the law.

#### a. *Background Facts*

The prosecution theorized that defendant went to Schmiedt's apartment to steal from her, and that he killed her during the course of a robbery and burglary. In turn, the defense asserted that defendant went to Schmiedt's home merely to "con" or talk her out of money, that he had no felonious intent to steal, and that while under the influence of drugs and alcohol he killed her in a fit of rage upon discovering her betrayal of him.[9] To counter the defense's strategy, the prosecution argued to the jury that "conning" was the same as stealing or theft by false pretenses, and that defendant's alleged plan to go to Schmiedt's apartment to con her out of money supported guilt

---

[9] According to the defense, the evidence at most showed that defendant had a plan to tell Schmiedt that he needed money for diving gear to retrieve "all kinds of money" from a lake in the State of Washington and that the two would then share the retrieved money. In reality, however, defendant would "just get the money and run." Defendant became enraged and killed Schmiedt after he caught her going through his personal belongings and discovered she was working with law enforcement to apprehend him.

findings on the burglary and first degree felony-murder counts, and a true finding on the burglary-murder special-circumstance allegation.

As relevant here, the trial court instructed the jury that the crime of burglary required proof that, at the time of the entry of the dwelling, defendant "had the specific intent to steal or take away someone else's property and intended to deprive the owner permanently of such property, or at the time of the entry such person had the specific intent to commit the crime of robbery."[10] Defendant did not request instructions on the meaning of the word "steal," or on theft, or on whether the act of conning constituted theft; consequently, no such instructions were given. After the jury found defendant guilty on the charged counts, however, the defense filed a motion for a new trial based in part on the court's failure to instruct on theft pursuant to CALJIC No. 14.02.

b. *Analysis*

■ Preliminarily, we observe that theft is not a necessarily included offense of burglary, so theft instructions were not required on that basis. (*People v. Bernal* (1994) 22 Cal.App.4th 1455, 1458 [27 Cal.Rptr.2d 839]; *In re Howe* (1955) 135 Cal.App.2d 604, 605 [287 P.2d 510].) Defendant does not argue otherwise.

To the extent defendant asserts the trial court's burglary instructions were erroneous or incomplete, such assertion is lacking in merit. First, defendant fails to identify any incorrect statement of the law within the instructions given. Second, "if defendant believed the instructions required clarification or modification, it was incumbent upon him to request it." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1140 [36 Cal.Rptr.2d 235, 885 P.2d 1].) Third, and in any event, the word "steal" required no further clarification; indeed, it has long been recognized that "steal" has "a fixed and well-defined meaning, and is, perhaps, in its common, every-day use and general acceptation, as well understood as any word in the English language." (*People v. Lopez* (1891) 90 Cal. 569, 572 [27 P. 427].)[11]

In claiming the failure to give theft instructions sua sponte was error, defendant essentially implies that such instructions would have materially

---

[10] In light of defendant's theories regarding his intoxication and sudden rage, the trial court also instructed the jury on voluntary intoxication and the crimes of second degree murder (§ 189), voluntary manslaughter (sudden quarrel or heat of passion) (§ 192, subd. (a)), and theft from a corpse (§ 642).

[11] The word "steal" is commonly understood as "the general term implying the taking of another's money, possessions, etc. dishonestly or in a secret or surreptitious manner." (Webster's New World Dict. (2d ed. 1982) p. 1393; see also Webster's 3d New Internat. Dict. (1981) p. 2232 ["to take and carry away feloniously and usu. unobserved"].) Another common understanding is that to steal means "to be a thief; practice theft." (Webster's New World Dict.,

differed from the instructions actually given, and that, had the jury received theft instructions, it would not have been misled into convicting him of burglary for entering Schmiedt's home with the intent to "con" her out of money. We are not persuaded on either point.

Here, the trial court instructed the jury that "[e]very person who enters a building with the specific intent to steal, take, or carry away the personal property of another of any value and with the further specific intent to deprive the owner permanently of such property, or with the specific intent to commit robbery, a felony, is guilty of the crime of burglary in violation of Penal Code Section 459." The court also instructed that to prove a burglary, "each of the following elements must be proved: [¶] One, a person entered a building; [¶] Two, at the time of the entry, such person had the specific intent to steal or take away someone else's property and intended to deprive the owner permanently of such property, or at the time of the entry such person had the specific intent to commit the crime of robbery."

Although the court did not specifically inform the jury it was instructing on theft (except for theft from a corpse), the instructions it gave were substantially similar to the standard instructions for theft that defendant identified in his motion for a new trial. CALJIC No. 14.02, which defines theft by larceny, provides: "Every person who steals, takes, carries, leads, or drives away the personal property of another with the specific intent to deprive the owner permanently of [his] [her] property is guilty of the crime of theft by larceny." (CALJIC No. 14.02 (2004); see also CALJIC No. 14.02 (5th ed. 1988).) Similarly, the standard instructions provide that the "specific intent" required for theft "is satisfied by either an intent to deprive an owner permanently of his or her property, or to deprive an owner temporarily, but for an unreasonable time, so as to deprive him or her of a major portion of its value or enjoyment." (CALJIC No. 14.03 (2004); see also CALJIC No. 14.02 (5th ed. 1988) [specific intent to permanently deprive].) That the standard instruction for theft intent substantially mirrors the trial court's burglary instruction is no coincidence. As the use note accompanying the theft intent instruction explains: "This instruction, if necessary, can be utilized for theft as well as other crimes such as burglary or robbery normally requiring an intent to permanently deprive an owner of property." (Use Note to CALJIC No. 14.03 (2004).) Defendant neglects to address this point, and fails to identify and explain what other instruction pertaining to theft might have been critical or even helpful to his case.

In any event, defendant identifies no legal or other authority supporting his contention that the type of "conning" he supposedly intended would not have

*supra*, at p. 1393; see also Webster's 3d New Internat. Dict., *supra*, at p. 2369 [defining "theft" as "the act of stealing" and "the taking of property unlawfully (as by robbery, embezzlement, fraud)"].)

constituted theft. This is not a case where the claimed intended conduct arguably did not amount to criminal theft because it merely involved the alleged making of unrealistic promises or the persuading of a victim to make an unwise investment. At trial, the defense suggested defendant went to Schmiedt's apartment to tell her that he needed money for diving gear to retrieve "all kinds of money" from a lake in the State of Washington. Although Schmiedt might think she could get rich with defendant, he simply intended to "just get the money and run."

Even assuming substantial evidence supported this scenario,[12] the jury could infer from the described circumstances that defendant intended to commit criminal theft. "Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another, . . . or who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money . . . is guilty of theft." (§ 484, subd. (a).) An intent to commit theft by a false pretense or a false promise without the intent to perform will support a burglary conviction. (E.g., *People v. Nguyen* (1995) 40 Cal.App.4th 28, 30–31 [46 Cal.Rptr.2d 840] [false pretenses].) Consequently, we reject the contention that defendant could not have been found guilty of burglary (or a burglary murder) for merely intending to "con" Schmiedt out of money in the manner described, as well as the assertion that the instructional omissions deprived him of a complete and meaningful defense.

*People v. Failla* (1966) 64 Cal.2d 560 [51 Cal.Rptr. 103, 414 P.2d 39] (*Failla*) does not aid defendant's position. In *Failla*, the trial court's burglary instructions included a reference to a defendant's intent and specific intent "to commit theft *'or any felony'* " (*id.* at pp. 563, 564, italics added), but there the evidence was such that inferences could have been drawn that the defendant intended to commit one or more felonies (e.g., oral copulation or felonious assault), or one or more misdemeanors (e.g., indecent exposure or battery), or acts that were unseemly but were not crimes (e.g., masturbation) (*id.* at p. 565). Under those circumstances, the trial court prejudicially erred in failing to further instruct which acts, among those which the jury could infer the defendant intended to commit, amounted to felonies. (*Ibid.*)

Unlike the situation in *Failla, supra,* 64 Cal.2d 560, the burglary instructions in this case did not contain ambiguous language referring to "any other felony." And here, the evidence was such that when defendant entered Schmiedt's apartment, he intended to commit no crime other than theft or robbery. The trial court's instructions clearly informed the jury that it could

---

[12] Defendant does not provide any record citations showing he introduced evidence actually supporting this scenario, and our review of the record discloses no such evidence.

convict defendant of burglary only if it found he entered the apartment with the specific intent to steal from or rob the victim.

In sum, the claimed omission did not constitute error, prejudicial or otherwise, and did not violate any of defendant's state or federal constitutional rights.

### 4. *CALJIC No. 2.15*

CALJIC No. 2.15 addresses the inference that may be drawn with regard to theft-related crimes when a defendant is found in conscious possession of recently stolen property. At trial, defendant agreed such an instruction should be given, but proposed a modification that would limit it to the crime of theft and omit reference to the crimes of robbery and burglary. Finding that defendant's interests would be better protected without the proposed modification, the court gave the following instruction tracking the language of CALJIC No. 2.15 (1989 rev.): "If you find that the Defendant was in conscious possession of recently stolen property, the fact of such possession is not by itself sufficient to permit an inference that the Defendant is guilty of the crime of robbery or burglary. Before guilt may be inferred, there must be corroborating evidence tending to prove the Defendant's guilt. However, this corroborating evidence need only be slight and need not by itself be sufficient to warrant an inference of guilt. [¶] As corroboration, you may consider the attributes of possession: Time, place and manner; that the Defendant had an opportunity to commit the crime charged; the Defendant's conduct; any other evidence which tends to connect the Defendant with the crime charged."

Defendant contends this instruction was erroneous because it (1) lessened the prosecution's burden of proof to establish guilt beyond a reasonable doubt and (2) unfairly favored the prosecution's theory of the case over that of the defense. In his view, the error requires reversal of his convictions because it violated his state and federal constitutional rights to a fair trial, effective assistance of counsel, a meaningful defense, a reliable determination of guilt and penalty, due process, and equal protection of the law. We cannot agree.

CALJIC No. 2.15 is properly given in cases in which the defendant's intent to steal is contested. (*People v. Smithey* (1999) 20 Cal.4th 936, 977 [86 Cal.Rptr.2d 243, 978 P.2d 1171].) The instruction does not create a mandatory presumption that operates to shift the People's burden of proof to the defense, for the instruction merely permits, but clearly does not require, the jury to draw the inference described therein. (*People v. Yeoman* (2003) 31 Cal.4th 93, 131 [2 Cal.Rptr.3d 186, 72 P.3d 1166], and cases cited.) Perhaps more to the point, there is nothing in the instruction that directly or indirectly addresses the burden of proof, and nothing in it relieves the prosecution of its burden to

establish guilt beyond a reasonable doubt. (*People v. Prieto* (2003) 30 Cal.4th 226, 248 [133 Cal.Rptr.2d 18, 66 P.3d 1123].) In any event, given the court's other instructions regarding the proper consideration and weighing of evidence and the burden of proof, there simply "is 'no possibility' CALJIC No. 2.15 reduced the prosecution's burden of proof in this case." (*Id.* at p. 248.)

Moreover, the instruction did not create a permissive presumption that violated due process, because " 'reason and common sense' " justified the suggested conclusion that defendant's conscious possession and use of recently stolen property tended to show his guilt of robbery and burglary. (*People v. Yeoman, supra*, 31 Cal.4th at p. 131; see *Ulster County Court v. Allen* (1979) 442 U.S. 140, 157 [60 L.Ed.2d 777, 99 S.Ct. 2213].) Not only did defendant's conscious possession and use of Schmiedt's bank card and check in the hours and days following the murder tend to show that he intended to rob or steal from Schmiedt when he went to her apartment the night of January 1, 1994, but his guilt of the charged offenses was further supported by the corroborating evidence that he had taken a hammer with him to the apartment, and that when Josephine Parson later asked defendant if "[w]hat happened" was "[b]ecause she would not give you the money," defendant responded, "[s]omething like that."

*Schwendeman v. Wallenstein* (9th Cir. 1992) 971 F.2d 313 does not support defendant's constitutional claim. There, the defendant challenged an instruction that permitted the jury to infer that he drove recklessly, solely from evidence that he drove in excess of the speed limit. (*Id.* at p. 316.)[13] *Schwendeman* found the challenged instruction constitutionally deficient because it told the jury, "in effect, that it could ignore all the other evidence, consider only the evidence of Schwendeman's speed, and if it found Schwendeman was exceeding the speed limit, that was enough to convict him—not of speeding, but of reckless driving." (971 F.2d at p. 316.) In stark contrast, the instruction here expressly told the jury that conscious possession of recently stolen property "is not by itself sufficient to permit an inference that the Defendant is guilty" of the charged crimes and that there must be corroborating evidence, albeit only slight, tending to prove his guilt. Accordingly, CALJIC No. 2.15 does not appear constitutionally deficient under *Schwendeman*'s analysis.

Finally, defendant contends that, in mentioning only the crimes of robbery and burglary, the instruction favored the prosecution's case by suggesting to

---

[13] The challenged instruction provided: " 'A person who drives in excess of the maximum lawful speed at the point of operation may be inferred to have driven in a reckless manner. [¶] This inference is not binding upon you and it is for you to determine what weight, if any, such inference is to be given.' " (*Schwendeman v. Wallenstein, supra*, 971 F.2d at p. 315.)

the jury that he was more likely guilty of robbery or burglary, rather than the lesser crime of theft from a corpse. He argues that reversal is mandated because the instruction deprived him of a valid defense to the charged crimes.

It is correct that CALJIC No. 2.15 generally is appropriate for theft prosecutions, as well as for robbery and burglary prosecutions. (See *People v. Prieto, supra,* 30 Cal.4th at p. 248.) But even assuming the instruction should have made reference to the crime of theft from a corpse, we find no basis for a reversal.

The trial court instructed the jury on the elements of the charged offenses of murder, robbery, burglary, first degree murder based on a murder committed during a robbery and burglary, and the lesser offenses of voluntary manslaughter and theft from a corpse, as well as on the special circumstances of murder in the commission of robbery and burglary. Consequently, the jury was instructed that robbery required the elements of force or fear, and that burglary required entry into a building with a specific intent to steal property or commit robbery, while theft from a corpse required only willfully and maliciously removing and keeping valuable items from a dead body. The court also expressly instructed the jury that it had to find the elements of each offense beyond a reasonable doubt, and that it could not find defendant guilty of theft from a corpse without first reaching a unanimous verdict of not guilty on the charges of robbery and burglary. Finally, the court cautioned the jury to not read into the court's actions or rulings any suggestion as to what the jury should find to be the facts or the proper verdict.[14]

Considering the instructions as a whole, we conclude the jury could not have misunderstood the challenged instruction as suggesting that defendant was more likely guilty of robbery and burglary than theft from a corpse. In view of the instructions, which taken together properly guided the jury's consideration of the evidence, and the ample evidence of defendant's guilt of robbery and burglary, any error was harmless because it is not reasonably probable that defendant would have received a more favorable outcome had the instruction included reference to the lesser offense. (See *People v. Prieto, supra,* 30 Cal.4th at p. 249 [finding no prejudice under *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243] where court erroneously failed to

---

[14] The court instructed: "I have not intended by anything that I have said or done, or by any questions that I may have asked, or by any ruling that I may have made, to intimate or suggest what you should find to be the facts, or that I believe or disbelieve any witness. If anything I have done or said seems to so indicate, you will disregard it and form your own conclusions. [¶] The purpose of the Court's instructions is to provide you with the applicable law so that you may arrive at a just and lawful verdict. Whether some instructions apply will depend upon what you find to be the facts. [¶] Disregard any instruction which applies to facts determined by you not to exist. Do not conclude that because an instruction has been given that I'm expressing an opinion as to the facts."

limit its CALJIC No. 2.15 instruction to theft offenses]; see also *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 101 [17 Cal.Rptr.3d 710, 96 P.3d 30] [same].)

> 5. *CALJIC Nos. 1.00, 2.01, 2.21.1, 2.22, 2.27, 2.51, 2.90, and 8.83*

Defendant contends the trial court gave several standard instructions that individually and collectively undermined and impermissibly lessened the requirement of proof beyond a reasonable doubt: CALJIC Nos. 1.00 (Respective Duties of Judge and Jury), 2.01 (Sufficiency of Circumstantial Evidence—Generally), 2.21.1 (Discrepancies in Testimony), 2.22 (Weighing Conflicting Testimony), 2.27 (Sufficiency of Testimony of One Witness), 2.51 (Motive), 2.90 (Presumption of Innocence—Reasonable Doubt—Burden of Proof), and 8.83 (Special Circumstances—Sufficiency of Circumstantial Evidence—Generally).

We have previously rejected such contentions, because "[e]ach of these instructions 'is unobjectionable when, as here, it is accompanied by the usual instructions on reasonable doubt, the presumption of innocence, and the People's burden of proof.' " (*People v. Kelly* (2007) 42 Cal.4th 763, 792 [68 Cal.Rptr.3d 531, 171 P.3d 548], and cases cited; see also *People v. Howard* (2008) 42 Cal.4th 1000, 1025–1026 & fn. 14 [71 Cal.Rptr.3d 264, 175 P.3d 13], and cases cited; *People v. Carey* (2007) 41 Cal.4th 109, 129–131 [59 Cal.Rptr.3d 172, 158 P.3d 743], and cases cited; *People v. Crew* (2003) 31 Cal.4th 822, 847–848 [3 Cal.Rptr.3d 733, 74 P.3d 820], and cases cited.) We do so here, as well.

Defendant further contends the instructions based on CALJIC Nos. 2.01 and 8.83 created an impermissible mandatory presumption that required the jury to accept any reasonable incriminatory interpretation of the circumstantial evidence unless defendant rebutted the presumption producing a reasonable exculpatory interpretation. We have repeatedly rejected these contentions, too. (E.g., *People v. Morgan* (2007) 42 Cal.4th 593, 620 [67 Cal.Rptr.3d 753, 170 P.3d 129]; *People v. Stewart* (2004) 33 Cal.4th 425, 521 [15 Cal.Rptr.3d 656, 93 P.3d 271]; *People v. Nakahara* (2003) 30 Cal.4th 705, 713–714 [134 Cal.Rptr.2d 223, 68 P.3d 1190].) Because these instructions were properly given, there is no merit to defendant's related contention that the prosecutor's arguments based on the language of these instructions increased their prejudicial impact.

B. *Penalty Phase Issues*

1. *Alleged Prosecutorial Misconduct*

Defendant contends the prosecutor's pervasive and egregious misconduct during closing penalty phase arguments to the jury deprived him of due process and a reliable sentence determination. Specifically, he claims the prosecutor committed prejudicial misconduct by (1) repeatedly denigrating the defense team; (2) attacking the integrity of defense counsel; (3) urging the jury to disregard relevant mitigating factors; and (4) mischaracterizing evidence and offering his own unqualified opinions on expert matters.

 The standards governing review of misconduct claims are settled. "A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such ' "unfairness as to make the resulting conviction a denial of due process." ' (*Darden v. Wainwright* (1986) 477 U.S. 168, 181 [91 L.Ed.2d 144, 106 S.Ct. 2464]; see *People v. Cash* (2002) 28 Cal.4th 703, 733 [122 Cal.Rptr.2d 545, 50 P.3d 332].) Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial. (*People v. Frye* (1998) 18 Cal.4th 894, 969 [77 Cal.Rptr.2d 25, 959 P.2d 183].) In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review. (*People v. Earp* (1999) 20 Cal.4th 826, 858 [85 Cal.Rptr.2d 857, 978 P.2d 15].)" (*People v. Alfaro* (2007) 41 Cal.4th 1277, 1328 [63 Cal.Rptr.3d 433, 163 P.3d 118].)

Notably, defendant made no objection and sought no curative admonition regarding any of the instances of misconduct raised on appeal. Accordingly, he has forfeited appellate review of each and every one of these claims. (*People v. Alfaro, supra*, 41 Cal.4th at p. 1328.) In any event, we find that none of the claims warrants relief, for the reasons below.

a. *Arguments Concerning Defense Experts*

Three mental health experts were called to support defendant's case in mitigation: psychologist Larry Nicholas, neuropsychologist John Wicks, and psychiatrist Albert Globus. Defendant contends the prosecutor sought to prejudice his case by maligning the integrity of these experts.

With respect to Dr. Nicholas, defendant asserts the prosecutor committed misconduct by arguing: "Now, Dr. Nicholas is a doctor, *he's not a Ph.D.* [¶] *He's a spin doctor.* He's like these guys you see on TV who go down and

talk to the political reporters, this is what we really want to say, and just kind of spin it around so it comes out the way they want it." (Italics added.)

Defendant next complains the prosecutor made the following improper argument concerning Dr. Wicks: "Let me talk just for a minute about Dr. Wicks. [¶] You know, in some respects he's probably our most helpful witness in this area of the—any problems the defendant might have had. [¶] *You know, he was just a little too glib, a little too self-assured, a little too cocky . . . .*" (Italics added.)

Defendant also criticizes the prosecutor's description of Dr. Globus as "kind of like a kid with a new toy" and as "being a little too grandiose," and the prosecutor's comments that the doctor was "really a fish out of water" and "just kind of a glib fellow" whose conclusions amounted to "psychobabble." Additionally, he complains the prosecutor ridiculed Dr. Globus's integrity and his career choice as a defense expert.

██ Even assuming these claims were preserved for review, we would reject them as meritless. Prosecutors are allowed "wide latitude in penalty phase argument, so long as the beliefs they express are based on the evidence presented." (*People v. Cook* (2006) 39 Cal.4th 566, 613 [47 Cal.Rptr.3d 22, 139 P.3d 492]; see *People v. Valdez* (2004) 32 Cal.4th 73, 133 [8 Cal.Rptr.3d 271, 82 P.3d 296] [prosecutor's conclusions "may not assume or state facts not in evidence [citation] or mischaracterize the evidence"].) Although prosecutorial arguments may not denigrate opposing *counsel's* integrity, "harsh and colorful attacks on the credibility of opposing *witnesses* are permissible. [Citations.]" (*People v. Arias* (1996) 13 Cal.4th 92, 162 [51 Cal.Rptr.2d 770, 913 P.2d 980] [claimed disparagement of defense expert was not misconduct].) Moreover, a prosecutor "is free to remind the jurors that a paid witness may accordingly be biased and is also allowed to argue, from the evidence, that a witness's testimony is unbelievable, unsound, or even a patent 'lie.' " (*Ibid.* [prosecutor properly implied that defense expert " 'stretch[ed] [a principle] for a buck' "]; see *People v. Alfaro, supra,* 41 Cal.4th at p. 1328 ["it is not misconduct to question a defense expert's veracity"].)

Although the prosecutor misstated the record when he said Dr. Nicholas was "not a Ph.D," the rest of his argument concerning the doctor, viewed in context, properly sought to point out the weaknesses of his testimony and conclusions, based on the evidence presented.[15] Moreover, the prosecutor's

---

[15] The prosecutor argued: "He came and testified, and basically he was here just to give us [defendant's] life's history, although it was under the cover of, perhaps, making a psychological diagnosis. [¶] I don't think he ever really did it, but in the process he laid out the basis of his opinion. Um, but basically the point was that he was able to lay out all this information

inaccurate comment was brief and was not used in support of critical or key points. Under these circumstances, we find no basis to sustain defendant's claim of prejudicial misconduct.

Likewise, the prosecutor's description of Dr. Wicks as being "a little too glib, a little too self-assured, a little too cocky" was not inappropriate or baseless name calling but was tied directly to the evidence indicating Dr. Wicks was misinformed about a test result: "You know, he was just a little too glib, a little too self-assured, a little too cocky throwing out all the remarks about the school system. I wonder how competent he would have been in his opinion if he had been properly informed about the results of the MRI test. [¶] Remember, he was told—or made a big production of how Dr. Globus told him the MRI test showed frontal lobe deficit. *Of course, that is what he was finding,* so boy we really got it here. [¶] Maybe his testimony would have been a little different had he not been so misinformed on that basic premise." (Italics added.) Defendant concedes on appeal that Dr. Wicks incorrectly recalled what Dr. Globus told him about the MRI finding, but he asserts the prosecutor improperly implied that Dr. Wicks based his neuropsychological evaluation on what Dr. Globus told him. Defendant's interpretation of the prosecutor's argument, however, is refuted by the italicized language in

---

about Richard Parson and what a horrible upbringing he had. [¶] But I want to ask you, was it really a reliable account of Richard Parson? [¶] Dr. Nicholas himself said Mr. Parson was an inconsistent historian. When you talk to Richard Parson—thirty-three percent of the information came from Richard Parson and the family whom they drew upon to get information hadn't really had any meaningful contact with Richard Parson in twenty years. [¶] Most of this was just a discussion about ancient history, things that happened years and years ago. [¶] Really doesn't have much bearing on events that took place here in Sacramento at 1000 Fulton Avenue. [¶] So, the basis of the information that Nicholas was getting is questionable. [¶] On top of that . . . he speculates those things and he discounts those things that don't fit nice and tidily within his theory of what he wants you to think about Richard Parson. [¶] . . . [¶] Now, it fits more into Mr. Nicholas's theory of things if Richard Parson could have been adopted and [Mr. and Mrs. Waters] wanted to adopt him, that great plan was torn asunder by the fact his parents moved back to Washington. [¶] He has to tear down Mr. and Mrs. Waters and in effect call them liars. [¶] Why does he do that. Why does he have to do that? [¶] Because he has a picture of Mr. Parson that he wants to put across to you to show you he was a poorly-treated person and a deprived child, a growing-up situation so that we all have to feel sorry for him. [¶] He is not—shouldn't be held responsible because he was created by all this evil that went on in his early life. [¶] Now, Dr. Nicholas is a doctor, he's not a Ph.D. [¶] He's a spin doctor. He's like these guys you see on TV who go down and talk to the political reporters, this is what we really want to say, and just kind of spin it around so it comes out the way they want it. [¶] This tale of sad childhood is so you will somehow divert the responsibility for the death of Theresa Schmiedt, [to] his mother, to his father to somebody drinking forty or fifty years ago, to the hard times in Iowa, to booze, something besides Richard Parson—something besides Richard Parson. [¶] To try to make you forget the mess that Richard Parson has made out of his life, to blame it on someone else."

the above quoted passage, and it appears the prosecutor was simply commenting on Dr. Wicks's level of confidence in his own finding of frontal lobe damage after having incorrectly recalled an independent but similar finding by Dr. Globus.

The prosecutor's arguments pertaining to Dr. Globus also were based on the evidence. In addressing the doctor's reliance on PET (positron emission tomography) and MRI (magnetic resonance imaging) scans in finding organic brain damage, the prosecutor argued: "We turn to Dr. Globus, who is kind of like a kid with a new toy. Remember, it's only been in use in Sacramento and in the country maybe five or six years. It's a relatively new thing. [¶] We have to be wary that, perhaps, Dr. Globus is being a little too grandiose about the capability of this machine and his capability to interpret what that machine can reveal." The prosecutor also commented that Dr. Globus was "really a fish out of water" and "just kind of a glib fellow" whose conclusions amounted to "psychobabble." Finally, in addressing the doctor's career choice after leaving a job at the University of California, Davis, the prosecutor remarked: "That's a darn good job at UC Davis. What does he do, he resigns. [¶] Where does that private practice come from, what does that do? He has got thirty patients he hardly ever sees. Why is that? He had found he can make a living working in court. [¶] There are people who will hire him to come in here and give these offhanded, glib opinions to try and make Richard Parson, who are just basically criminals, into the sort of person who has a brain problem that we should all feel sorry about. [¶] And you can understand why because, you know, for seeing a guy for four hours, talking to Richard Parson for four hours and writing a report, Dr. Globus is going to get paid nine or ten-thousand dollars. That's not too bad. [¶] . . . [¶] There is—really, Dr. Globus is kind of, I would say, describing his medical career, he's a washed-up doctor who has now just become a professional witness. And that only works if you say things that your clients want to hear."

We conclude that none of the identified comments relating to these three defense experts constituted misconduct. By and large, the prosecutor's comments merely cautioned the jury to carefully scrutinize their testimony and to examine the source and content of the information providing the bases of their opinions. Although many of the remarks were unflattering (e.g., "a spin doctor," "glib," "cocky," "grandiose," "a fish out of water," "psychobabble"), the prosecutor was entitled to argue vigorously and use appropriate epithets based on inferences and deductions drawn from the evidence. (*People v. Hill* (1998) 17 Cal.4th 800, 819 [72 Cal.Rptr.2d 656, 952 P.2d 673]; see *People v. Valdez, supra*, 32 Cal.4th at p. 134.)

We observe, however, that even though the prosecutor could and did properly argue to the jury that Dr. Globus may have been biased given his

status as a paid witness (*People v. Arias, supra,* 13 Cal.4th at p. 162), his one reference to Dr. Globus as "a washed-up doctor" was inappropriate because it did not appear tied to any evidence. Nonetheless, the comment was not misconduct, prejudicial or otherwise, because it was isolated in nature and did not render the trial fundamentally unfair. (*Darden v. Wainwright, supra,* 477 U.S. at p. 181; see *People v. Cash, supra,* 28 Cal.4th at p. 733.) Moreover, the comment did not amount to the use of deceptive or reprehensible methods for purposes of persuasion (*People v. Cash, supra,* 28 Cal.4th at p. 733; *People v. Frye, supra,* 18 Cal.4th at p. 969), and there is no reasonable possibility the comment influenced the penalty verdict (*People v. Lenart* (2004) 32 Cal.4th 1107, 1130 [12 Cal.Rptr.3d 592, 88 P.3d 498]; *People v. Cunningham* (2001) 25 Cal.4th 926, 1019 [108 Cal.Rptr.2d 291, 25 P.3d 519]).

### b. *Remarks Concerning Defense Counsel*

Defendant also contends the prosecutor attacked the integrity of defense counsel during closing argument for (1) their hiring of Dr. Globus and (2) their putting a "subtle little spin on things" by attempting to shift responsibility for Schmiedt's death from defendant to the government.

Even assuming these claims were preserved for review, we would find no misconduct. With regard to the first claim, defendant once again focuses on the portion of the closing argument where the prosecutor commented that Dr. Globus resigned from his job at the University of California, Davis and then remarked the doctor "had found he can make a living working in court. [¶] There are people who will hire him to come in here and give these offhanded, glib opinions to try and make Richard Parson, who are just basically criminals, into the sort of person who has a brain problem that we should all feel sorry about." To the extent this argument can even be understood to refer to defense counsel, there was nothing inappropriate about it. (*People v. Arias, supra,* 13 Cal.4th at p. 182 ["[a]n argumentative reminder that defense counsel may have chosen Dr. Globus [for an expert opinion that was implausible but favorable to the defendant's case] is not equivalent to an insinuation that counsel suborned perjury or engaged in deception"].)[16]

As for the second claim, the prosecutor's argument stated in full: "And I just couldn't believe it when I heard [defense counsel] suddenly suggesting that maybe the death of Theresa Schmiedt was the responsibility of Curt Ellingson of the United States Marshal's Office because they asked her to help them. [¶] *Isn't that another just a subtle little spin on things?* [¶] It's not

---

[16] Dr. Globus also testified as a defense expert at the penalty phase in *People v. Arias, supra,* 13 Cal.4th 92.

Richard Parson's fault that he battered Theresa Schmiedt's head to smith-ereens, it's somehow the government's fault because they were asking her to help them." (Italics added.)

Again, no misconduct appears. The prosecutor offered this argument after defense counsel made an argument that focused the jury's attention on the question of "the government's role" in the case. Noting the failure of the United States Marshals office to designate defendant as dangerous, defense counsel argued: "I think it's important to ask what the government's role was in this because certainly, um, Deputy US Marshal Ellingson was in a position, and his office was in a position to know whether this was appropriate conduct, or an appropriate situation to put Ms. Schmiedt in, something that was appropriate to ask her to do." Thus, the "subtle little spin" comment was a fair response to defense counsel's argument implying that the government may have been at least partially at fault for what happened. (See *People v. Cook, supra,* 39 Cal.4th at p. 613 [prosecutorial reference to defense's "heavy spin" on the evidence was not misconduct].)

### c. *Argument Pertaining to Mitigating Evidence*

Defendant argues the prosecutor violated the law and deprived him of a fair penalty determination by telling the jury that its job as a sentencing body was not to consider his background or other relevant mitigating evidence, but solely to seek justice for the victim's death. Specifically, he refers to the prosecutor's argument that "the question for you folks is what should be the punishment for the murder of and the murderer of Theresa Schmiedt. That's the question here. [¶] . . . [¶] We are not here to decide why crime occurred. *We are not here to decide how personalities develop over fifty-three years, whether you have an alcoholic mother, you are predestined to kill someone fifty-three years later.* [¶] We are not here to decide that. [¶] We are here to decide what is the appropriate punishment for Theresa Schmiedt. [¶] And there are two compelling reasons that I say virtually dictate the answer to that question that—that really leave you with no choice. And that's the nature of the crime and the nature of the killer as shown by his criminal-conviction history. This is a brutal killing by a lifelong criminal. [¶] What else can we do with him for what he's done and the way he has lived." (Italics added.)

Even assuming this claim was preserved for review, the prosecutor did not exceed the bounds of proper argument. As the record discloses, the prosecut-or first addressed all the aggravating factors, including the circumstances of the crime and defendant's 10 prior felony convictions. He then pointed out the lack of evidence supporting the defense's "rage killing" theory. When the prosecutor next turned to the defense's mitigating evidence, he did not urge the jury to disregard or ignore such evidence. Instead, he remarked that "the

mitigating effect of [the defense's] evidence gets washed out because when you look at it as a whole for every step forward they took—one step forward they took, they ended up stepping back one." After reminding the jury of various facts that undercut the mitigating force of defendant's background evidence, the prosecutor again argued: "[S]o the mitigating evidence that they have tried to present, at least in terms of his life history, for everything they can try and say is good about him is offset by something bad, to the point to where the mitigating evidence in that regard just washes out. And it has no force and effect. [¶] When you weigh it, then, in the balance which the judge will instruct you, there is just no weight to it, it just doesn't have any kind of picture that is deserving of sympathy or deserving of any mitigating effect as far as Richard Parson and the punishment that he deserves for his crime." Subsequently, the prosecutor reviewed the testimony of defendant's mental health experts and, after highlighting what he viewed as weaknesses, told those jurors who might be "having difficulty" in voting for a death sentence to ask themselves: "Are you concerned because of your own personal qualms, or is it something really based on the evidence. [¶] Is there something about this evidence that tells you that Richard Parson shouldn't be punished in the ultimate fashion, in the most serious fashion known to the law? [¶] Is there something really there that strikes you as so mitigating that the appropriate punishment is . . . life without parole."

Contrary to defendant's contention, the record does not reflect that the prosecutor told or otherwise suggested to the jury that its job was not to consider defendant's background or other relevant mitigating evidence. Rather, the record confirms that the prosecutor consistently and properly argued to the jury that, based on the evidence presented, it could and should conclude that defendant's evidence was not sufficiently mitigating so as to outweigh the heinous nature of the crimes committed or the other factors in aggravation. (*People v. Sims* (1993) 5 Cal.4th 405, 464 [20 Cal.Rptr.2d 537, 853 P.2d 992]; see *People v. Seaton* (2001) 26 Cal.4th 598, 682 [110 Cal.Rptr.2d 441, 28 P.3d 175] ["the prosecutor did not ask the jury to ignore defendant's mitigating evidence, but merely argued that the circumstances of the murder outweighed that evidence . . ."].) No misconduct appears.

### d. *Factual Statements, Evidentiary Characterizations, and Personal Opinion*

Defendant argues the prosecutor committed misconduct by misstating facts, mischaracterizing the evidence, and injecting his own personal opinions regarding the mental health evidence. The prosecutor's deliberate misrepresentation of the evidence, he argues, denied him his state and federal constitutional rights to a fair trial, impartial jury, effective assistance of counsel, freedom from cruel and unusual punishment, equal protection, and due process of law.

Although the prosecutor argued that marks found on Schmiedt's neck demonstrated defendant's intent to strangle and kill her, he also argued that defendant was "[m]aybe trying to feel for a pulse in her neck" so that "if she isn't dying," he could "hit her again because he wanted her dead. [¶] Isn't that thoughtful premeditation and deliberate conduct." Defendant claims this latter argument misrepresented Dr. Reiber's cross-examination testimony that (1) given the number and severity of the blows to Schmiedt's head, a rage-induced "overkill" may have occurred; and (2) the neck marks reflected "partial strangulation" that "probably would have occurred fairly early in the entire episode, and perhaps as part of the initial attempt to restrain the individual so that blows [to the head] could be administered."

Even assuming this claim was preserved for review, we see no basis for a finding of misconduct. The prosecutor's argument rested on inferences drawn from Dr. Reiber's testimony, and the record does not support defendant's charge of prosecutorial misrepresentation. (*People v. Valdez, supra*, 32 Cal.4th at pp. 133–134.) Dr. Reiber clearly explained that a rage-induced "overkill" was but one theory indicated by the physical evidence,[17] and he expressly stated his testimony regarding the circumstances of the strangulation was something he "could easily envision" but was simply "[a] hypothetical scenario." Notably, the doctor was not asked whether the neck marks could not have resulted from an attempted pulse checking, so his testimony did not rule that out as an alternative possible scenario. Dr. Reiber did, however, testify that Schmiedt's skull had been shattered by one of the first head blows, which would have rendered her unconscious. He also testified that all but maybe one of the head blows were likely delivered premortem, and he agreed with the prosecution that a person might check for a pulse to ascertain whether a victim who was injured but not moving or responding was in fact dead. Contrary to defendant's contention, the evidence presented was susceptible to the interpretation that Schmiedt was rendered unconscious after the first head blow, that defendant may have checked for a pulse at that point and may have pressed hard enough on her neck to leave marks, and that defendant then continued bashing at her skull to make sure she was dead. No misconduct appears.[18]

Defendant next contends the prosecutor misrepresented the testimony and expert finding of Dr. Wicks that defendant was mildly to moderately impaired, and improperly injected his own unqualified opinion on the matter. He claims the prosecutor misled the jury in arguing that defendant was a malingerer and

---

[17] Dr. Reiber also testified it would not be surprising to see similar injuries associated with an assailant who was under the influence of drugs.

[18] To the extent defendant further contends, without additional elaboration, that this alleged misconduct "deprived [him] of lingering doubt," we reject the contention for the same reason above.

that Dr. Wicks's finding of impairment could not be trusted because defendant likely faked his illness. In particular, defendant asserts the prosecutor lied when he told the jury that defendant faked chest pains in 1986, and that the doctor who examined him in 1986 said, " 'Hey, this guy is just faking it, there is nothing wrong.' " To support the claim of misconduct, defendant refers to Dr. Globus's cross-examination testimony that, according to 1986 records, defendant's condition at that time was serious enough to warrant a CT (computerized tomography) scan and three days of hospitalization. Defendant further argues the prosecutor substituted his own unqualified opinion of the evidence when he argued that all the tests really showed was "a little bit of slowing in thinking," and that defendant's actual impairment was "meaningless in the context we have here" and "not really a biggie."

Even assuming these claims were preserved for review, our review of the record discloses no misconduct. In challenging the significance of Dr. Wicks's finding that defendant was mildly to moderately impaired, the prosecutor properly referred to the evidence that defendant, at the time of Schmiedt's murder, engaged in a number of activities demonstrating he "can get along just fine." As the prosecutor pointed out, defendant appeared to have no trouble when he used the telephone, talked the victim into letting him into her apartment, "socialized with the victim enough to get her to feel comfortable so that she becomes more vulnerable to his attack," went from Sacramento to Stockton after the murder, figured out the victim's ATM number to gain access to her bank accounts, checked into a motel, and then fled from the motel and got all the way to Vancouver, Washington to escape apprehension. Given such evidence, the prosecutor did not mislead the jury or otherwise offer an unqualified opinion when he argued, among other things, "We really have to wonder if there is really any deficit at all. [¶] If there is, it's not much and it's really meaningless in the context we have here."

As for the prosecutor's argument that a doctor "said" in 1986 that defendant was " 'just faking it, there is nothing wrong,' " it appears he was referring to the circumstances that a 1986 medical record indicated that the examining doctor was suspicious of malingering, that the doctor nonetheless ordered tests for defendant, and that the test results came back negative. Although we do not condone this particular argument to the extent it inaccurately equated the examining doctor's suspicions of malingering with an actual medical conclusion that defendant was "just faking it," it had no conceivable impact on the verdict and was, at most, harmless prosecutorial hyperbole. (See *People v. Sully* (1991) 53 Cal.3d 1195, 1235 [283 Cal.Rptr. 144, 812 P.2d 163] [addressing claimed factual inaccuracies in prosecutor's guilt phase argument].)

Finally, defendant argues the prosecutor made a number of unfounded assumptions regarding Dr. Globus's findings concerning defendant's PET and

MRI results. Among other things, he challenges the prosecutor's argument that "a hypometabolism in the right temporal lobe and asymmetry is not that big a kind of deal. It's like being right-handed or left-handed. One hand may be stronger than the other." He also claims the prosecutor mischaracterized the evidence when he suggested that the PET and MRI scans did not indicate "mental damage," and that the doctor who actually performed the scans did not specify that a defect existed.

Even if this claim was preserved for review, we would reject it on the merits. Taken in context, the prosecutor's remarks constituted fair comment on the state of the expert testimony. For instance, Dr. Globus agreed it was "possible" that "this asymmetry has no effect whatsoever on [defendant's] behavior." With regard to asymmetry, the doctor also agreed it generally was "a matter of degree . . . that may account for some functional deficit," and that "the greater the difference" between the two sides, "the more likely it is to be abnormal." On this point, Dr. Globus admitted "the difference is not large here," and he further agreed it was possible to describe defendant's hippocampus structure as showing that one side was "different" from the other, instead of characterizing the structure as "abnormal." He also conceded that "most people who have some kind of brain deterioration or damage are able to control their aggressive impulses." In light of Dr. Globus's equivocal testimony, the challenged arguments were proper.

### e. *Ineffective Assistance of Counsel and Cumulative Prejudice*

Because the prosecutor did not commit misconduct in making any of the arguments challenged on appeal, defense counsel did not render ineffective assistance in failing to object or seek admonishment with respect to those arguments.

Having rejected each of defendant's claims of prosecutorial misconduct, we reject his further claim that the cumulative impact of the alleged misconduct resulted in prejudice and deprived him of a fair trial and due process. (*People v. Alfaro, supra*, 41 Cal.4th at p. 1330; *People v. Valdez, supra*, 32 Cal.4th at p. 136.)

### 2. *Intercase Proportionality*

Defendant contends that California's failure to provide for intercase proportionality review in capital cases violates his federal constitutional right to be protected from the arbitrary and capricious imposition of capital punishment.

We have held, on numerous occasions, that intercase proportionality review is not constitutionally required in this state. (*People v. Kelly, supra*, 42 Cal.4th

at p. 800, and cases cited; *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1067 [47 Cal.Rptr.3d 467, 140 P.3d 775], and cases cited; *People v. Stitely* (2005) 35 Cal.4th 514, 574 [26 Cal.Rptr.3d 1, 108 P.3d 182], and cases cited; see *Pulley v. Harris* (1984) 465 U.S. 37, 50–51 [79 L.Ed.2d 29, 104 S.Ct. 871].)

Although defendant's death sentence is theoretically subject to intracase proportionality review (*People v. Stitely, supra,* 35 Cal.4th at p. 574), he does not appear to raise such a claim. In any case, the sentence is not grossly disproportionate to defendant's moral culpability.

### 3. *California's Death Penalty Statute and Related Instructions*

Defendant claims California's death penalty statute and the jury instructions thereunder are constitutionally flawed for numerous reasons. We affirm the decisions that have rejected identical claims, as follows.

As applied, section 190.3, factor (a), does not result in the arbitrary and capricious imposition of the death penalty. (*People v. Alfaro, supra,* 41 Cal.4th at pp. 1330–1331; *People v. Smith* (2005) 35 Cal.4th 334, 373 [25 Cal.Rptr.3d 554, 107 P.3d 229]; *People v. Brown* (2004) 33 Cal.4th 382, 401 [15 Cal.Rptr.3d 624, 93 P.3d 244].)

The trial court need not delete inapplicable sentencing factors from its instructions. (*People v. Kelly, supra,* 42 Cal.4th at p. 801; *People v. Stitely, supra,* 35 Cal.4th at p. 574; *People v. Yeoman, supra,* 31 Cal.4th at pp. 164–165.)

"The trial court did not commit constitutional error by failing to instruct that statutory mitigating factors were relevant only in mitigation. [Citations.] Moreover, 'the statutory instruction to the jury to consider "whether or not" certain mitigating factors were present did not impermissibly invite the jury to aggravate the sentence upon the basis of nonexistent or irrational aggravating factors. [Citations.]' " (*People v. Beames* (2007) 40 Cal.4th 907, 935 [55 Cal.Rptr.3d 865, 153 P.3d 955]; see *People v. Gray* (2005) 37 Cal.4th 168, 236 [33 Cal.Rptr.3d 451, 118 P.3d 496].)

Section 190.3's use of adjectives such as "extreme" and "substantial" within the list of mitigating factors did not impermissibly limit the jury's

consideration of such factors. (*People v. Kelly, supra,* 42 Cal.4th at p. 801; *People v. Beames, supra,* 40 Cal.4th at p. 934.)

The failure of the court's instruction to require specific written findings by the jury with regard to the aggravating factors found and considered in returning a death sentence did not violate defendant's constitutional rights to meaningful appellate review and equal protection of the law. (*People v. Stitely, supra,* 35 Cal.4th at p. 574; see also *People v. Morgan, supra,* 42 Cal.4th at p. 627; *People v. Stevens* (2007) 41 Cal.4th 182, 212 [59 Cal.Rptr.3d 196, 158 P.3d 763]; *People v. Carey, supra,* 41 Cal.4th at p. 136.)

" '[C]apital and noncapital defendants are not similarly situated and therefore may be treated differently without violating constitutional guarantees of equal protection of the laws or due process of law.' " (*People v. Stevens, supra,* 41 Cal.4th at p. 212; see also *People v. Carey, supra,* 41 Cal.4th at pp. 136–137.)

The death penalty statute is not unconstitutional for failing to assign a burden of proof and standard of proof for finding aggravating and mitigating circumstances in reaching a penalty determination. (*People v. Beames, supra,* 40 Cal.4th at p. 935; *People v. Lewis and Oliver, supra,* 39 Cal.4th at p. 1066; *People v. Stitely, supra,* 35 Cal.4th at p. 573.)

The jury need not agree unanimously as to aggravating factors, or make specific findings or find beyond a reasonable doubt that aggravating factors exist (except for other unadjudicated violent criminal activity), that such factors outweigh mitigating factors, or that death is the appropriate punishment. (*People v. Morgan, supra,* 42 Cal.4th at pp. 626–627; *People v. Stevens, supra,* 41 Cal.4th at p. 212; *People v. Beames, supra,* 40 Cal.4th at p. 934.) Nothing in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], or *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531], casts doubt on these conclusions. (*People v. Mendoza* (2007) 42 Cal.4th 686, 707 [68 Cal.Rptr.3d 274, 171 P.3d 2]; *People v. Ramirez* (2006) 39 Cal.4th 398, 475 [46 Cal.Rptr.3d 677, 139 P.3d 64]; *People v. Stitely, supra,* 35 Cal.4th at p. 573.)

Even in the absence of an explicit instruction to the contrary, it was not reasonably likely the jury believed it was bound by the reasonable doubt

instruction given during the guilt phase in deciding whether evidence can count in defendant's favor as mitigating. "On the contrary, because the trial court instructed specifically that the reasonable doubt standard applied [to whether the jury could consider defendant's alleged prior unadjudicated violent criminal activity as an aggravating factor], and mentioned nothing about mitigating factors, the reasonable juror would infer that no such reasonable doubt standard applied to mitigating factors." (*People v. Welch* (1999) 20 Cal.4th 701, 767 [85 Cal.Rptr.2d 203, 976 P.2d 754].)[19]

In light of the moral and normative nature of the jury's sentencing determination, the trial court need not instruct that the prosecution bears the burden of persuasion on the issue of penalty. (*People v. Smith* (2007) 40 Cal.4th 483, 526 [54 Cal.Rptr.3d 245, 150 P.3d 1224]; *People v. Combs* (2004) 34 Cal.4th 821, 868 [22 Cal.Rptr.3d 61, 101 P.3d 1007]; *People v. Lenart, supra*, 32 Cal.4th at p. 1136.)

The trial court's failure to instruct the jury on the presumption of life did not violate defendant's constitutional rights to due process, to be free from cruel and unusual punishment, to a reliable determination of his sentence, and to equal protections of the laws. (*People v. Abilez* (2007) 41 Cal.4th 472, 532 [61 Cal.Rptr.3d 526, 161 P.3d 58]; see also *People v. Kelly, supra*, 42 Cal.4th at p. 800; *People v. Stitely, supra*, 35 Cal.4th at p. 573.)

The trial court properly instructed the jury with CALJIC No. 8.88, a standard penalty phase instruction defining the scope of the jury's sentencing discretion and the nature of its deliberative process. The instruction was not constitutionally deficient or impermissibly vague because (1) it used the phrase "so substantial" to compare aggravating factors with the mitigating factors; (2) it failed to instruct the jury that, if it determined the factors in mitigation outweigh the factors in aggravation, it was required to return a sentence of life without possibility of parole; and (3) it failed to inform the jury that defendant did not have the burden to persuade it that the death penalty was inappropriate. (*People v. Geier* (2007) 41 Cal.4th 555, 618–619 [61 Cal.Rptr.3d 580, 161 P.3d 104], and cases cited; see also *People v. Kelly, supra*, 42 Cal.4th at p. 800; *People v. Carter* (2003) 30 Cal.4th 1166, 1226 [135 Cal.Rptr.2d 553, 70 P.3d 981].)

---

[19] The trial court mistakenly instructed the jury that defendant's alleged prior convictions had to be proven beyond a reasonable doubt. This misstatement of the law, however, inured to defendant's benefit and does not detract from our conclusion above. (See *People v. Welch, supra*, 20 Cal.4th at p. 766 [reaching same conclusion where trial court mistakenly instructed that *any* factor in aggravation had to be proven beyond a reasonable doubt].)

### 4. *International Law*

The California death penalty statute does not violate international law, specifically, the International Covenant on Civil and Political Rights, even assuming defendant has standing to invoke this covenant. (*People v. Ramirez, supra,* 39 Cal.4th at p. 479, and cases cited; see also *People v. Morgan, supra,* 42 Cal.4th at pp. 627–628, and cases cited; *People v. Roldan, supra,* 35 Cal.4th at p. 744.)

### 5. *Cumulative Error*

Defendant contends the cumulative effect of the errors in both the guilt phase and the penalty phase requires reversal of his convictions and death sentence. Not so. We have concluded that all of the claimed errors are either meritless or do not require reversal. Whether we consider such claims individually or together, we find no prejudicial error at either phase of the proceedings.

### III. Disposition

For the reasons stated above, we find no reversible error in the record. The judgment of death is affirmed.

George, C. J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

**KENNARD, J.,** Concurring.—I concur fully in the majority opinion. I write separately to suggest a simpler ground on which to reject defendant's claim that the trial court erred in failing to instruct on assault as a lesser included offense of robbery and/or burglary. (See maj. opn., *ante,* at pp. 348–351.)

The purpose of instructing on lesser offenses is to provide the jury with verdict options that are consistent with the evidence presented at trial. "Just as the People have no legitimate interest in obtaining a conviction of a greater offense than that established by the evidence, a defendant has no right to an acquittal when that evidence is sufficient to establish a lesser included offense." (*People v. Sedeno* (1974) 10 Cal.3d 703, 716 [112 Cal.Rptr. 1, 518 P.2d 913]; accord, *People v. Breverman* (1998) 19 Cal.4th 142, 155 [77 Cal.Rptr.2d 870, 960 P.2d 1094].) Accordingly, a trial court must instruct on a lesser included offense "only when evidence exists that would justify a conviction on the lesser offense." (*People v. Yeoman* (2003) 31 Cal.4th 93, 129 [2 Cal.Rptr.3d 186, 72 P.3d 1166].)

Here, no instruction on assault was required because defendant did not merely assault victim Theresa Schmiedt, he killed her. If defendant did not form the specific intent to steal until after he had killed her, as the defense argued at trial, then he was guilty of at least manslaughter, and not merely assault. Because there was no substantial evidence that defendant's assaultive conduct was not the cause of her death, the offense was not less than manslaughter, and no instruction on assault was required.

Appellant's petition for a rehearing was denied September 10, 2008.