Filed 7/11/24  P. v. Torres CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JESSE TORRES,<br><br>    Defendant and Appellant. | G062472<br><br>(Super. Ct. No. 18HF1516)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Gary S. Paer, Judge.  Affirmed.

Jennifer A. Gambale, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Daniel J.

Hilton and Steve Oetting, Deputy Attorneys General, for Plaintiff and Respondent.

*       *       *

Jesse Torres appeals from a judgment of conviction for the murder of Noah Finnegan.  (Pen. Code, § 187, subd. (a).)[1]  He contends the prosecutor committed reversible error by appealing to the jurors' sympathy during closing argument.  We disagree and affirm the judgment.

**FACTS**

One Halloween day, Torres was hanging out with C.B., who was his coworker and neighbor (the coworker), at the apartment complex where they lived in Mission Viejo.  In the complex's parking lot, they ran into another neighbor, C.D.  The coworker, who knew C.D., introduced him to Torres.  C.D. was throwing a party that night, and the coworker asked if he and Torres could come.  C.D. said yes.

Torres and the coworker left to buy alcohol and returned at 7:30 p.m. to C.D.'s apartment.  They sat down on his couch and started drinking.  They had purchased a 1.75 liter bottle of whiskey; each drank about half the bottle over the span of 60 to 90 minutes.  They also smoked marijuana.

At the height of the party, anywhere from 30 to 50 people were in or around C.D.'s one-bedroom, one-bath apartment.  Throughout the night, many partygoers drank beer and smoked marijuana and were at varying levels of intoxication.  According to several partygoers, Torres appeared

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

2

drunk.  Finnegan, then 19 years old, had been drinking beer, maybe three to four, and was "a little bit buzzed."

The coworker didn't know anyone at the party other than C.D. and Torres.  C.D. and his other guests were younger than Torres and the coworker.  Few people interacted with Torres at the party.

Near midnight, Torres ran into M.F., then 18 years old, and one of her friends in the bathroom.  The bathroom was separated in two, with the "sink [open to and thus] more in the bedroom" and the toilet behind a separate door.  At the bathroom sink area, Torres saw M.F., who was feeling sick from drinking.  He asked M.F.'s friend, "'she looks pretty f-ed up [referring to M.F.], is everything fine?'"  Torres began touching M.F.'s hair and placed his hand on her back.  Because he kept touching her hair, the friend told him to stop: "'[S]he's fine, don't touch her.'"

About half an hour later, Torres ran into a girl who "was really intoxicated" and "passed out sleeping on the bed."  Torres commented to a partygoer, "'she looks pretty f-ed up.  I think it would be easy for me to get with that.'"

When C.D. learned of Torres's behavior, C.D. told the coworker that Torres was "doing things that aren't right" and the two of them had to go.  The coworker called for Torres and the two walked outside the apartment.  When the coworker told Torres they needed to leave the party, Torres punched him in the jaw.  Torres said nothing.  The coworker didn't fight back; the punch "was pretty strong" and the coworker "got scared."

The coworker returned to C.D.'s apartment and told him about the punch.  C.D. gave him ice for his jaw and allowed him to stay at the party.

Ten minutes later, C.D. peered outside the front door and saw Torres standing outside wearing different clothes.  C.D. told Torres to go home and, after watching Torres walk away, went back inside, and locked the apartment door.

Torres later returned and kicked in the front door.  He was standing outside, his hands in a defensive position as if ready for a fight.  Eight to 10 people rushed outside toward Torres, causing him to back up.  This group included C.D. and Finnegan.  The group advanced and yelled, "We don't want you here, go away!"  Torres responded, "this is my town," and appeared angry.  After one person in the group backed Torres into a wall, Torres punched him.

The group became more aggressive, advancing toward Torres, yelling at him, and backing him up toward the street.  As the group advanced, Torres stated, "I will fight all ten of you."  Torres punched a second partygoer, and the two started fighting.  Other people jumped in, some to also fight Torres and others "to pull it apart."

Torres's brother and brother-in-law, both of whom lived with Torres, were at their apartment when they heard what sounded like kids running and yelling outside.  The brother-in-law heard Torres scream for help.  The brother-in-law ran outside to help Torres and saw him near the bushes being jumped by the group.  The brother-in-law ran over to defend Torres, threw some punches, and pulled people off Torres until he was able to stand up.

During the melee, Finnegan punched the brother-in-law in the head about five times and tackled Torres into the bushes.  Within a minute, Torres stood up.  Finnegan then walked over to C.D.  C.D. saw Torres walk away but didn't see where he had gone.

The brother-in-law stopped fighting and joined C.D., Finnegan, and Torres's brother, who started asking why Torres was being attacked. All participants were standing together talking calmly. About five minutes later, Torres returned, long knife in hand, ran toward Finnegan, and fatally stabbed him on the side of the neck.

Torres immediately ran back toward his apartment. Torres's brother yelled after him, "Why did you do that? Why? Why?" The brother approached the window of their apartment and called to his sister, who also lived there with her children, to get the children and exit out of the window. When the sister and children exited the front door, Torres appeared and told his brother to get inside because "someone is going to kill" the brother. The brother instead left with his sister and the children to stay with a neighbor.

When the police arrived, Torres came out of his apartment, agitated and "in a rage," yelling "I'm Jesse!" and obscenities. A search of Torres's apartment uncovered a bloody eight-inch stainless steel knife in the kitchen.

An amended information charged Torres with a single count of murder (§ 187, subd. (a)) and alleged that he personally used a deadly weapon during the murder (§ 12022, subd. (b)(1)) and that he previously suffered a juvenile adjudication for a serious and violent offense (§§ 667, subds. (d), (e)(1), 1170.12, subds. (b), (c)(1)).

At trial, Torres's brother testified that after the initial fight calmed down, Torres "just went inside" their apartment. When asked about their subsequent conversation with C.D. and Finnegan, the brother testified it was "civil" and "calm," and the brother-in-law described it as a "calm conversation" with no verbal or physical fighting. Torres's brother testified that after Torres ran up to Finnegan but before he stabbed him, Torres and

Finnegan were engaged in trash talking.  But the brother-in-law testified Finnegan "was just standing there" when Torres returned.  The brother-in-law also identified the knife used to stab Finnegan as a kitchen knife from his and Torres's apartment.

Torres did not dispute he killed Finnegan; instead, he argued he committed manslaughter, not murder, because he acted out of heat of passion or imperfect self-defense or defense of others.  Accordingly, the jury was instructed on, among other things, first degree murder; second degree murder; the effect of provocation on murder; and voluntary manslaughter, both heat of passion and imperfect self-defense or imperfect defense of others.

In closing and over defense objection, the prosecutor argued: "But I'm going to ask you, because you as a jury have the right to sanction the use of deadly force.  We all have that as citizens, the right to use deadly force.  I think that we would all want that if we were ever confronted with that situation, and hopefully we never are.  [¶]  But you are going to speak for the community about whether or not deadly force was reasonable in this situation and whether it was justified or whether it reduced really a cold blooded murder to a manslaughter."

Showing the jury photos of Torres after his arrest, the prosecutor argued Torres suffered some scratches but not enough to warrant the use of deadly force against Finnegan.  The prosecutor told the jury to consider the "couple of scratches versus a 19-year-old who has a hole on the side of his head."  The prosecutor continued: "And as I said, you will speak for the community.  When you go back and you discuss this case, and I know you will, you have been very attentive.  After you listen to [defense counsel] and hear everything he has to say, you will get a chance to go back and make a decision and speak for the community on this case."

6

The jury acquitted Torres of first degree murder, found him guilty of second degree murder, and found he personally used a deadly weapon. Later that day, the trial court found the prior allegation to be true. The court sentenced Torres to 30 years to life in state prison for the murder, plus one year for the deadly weapon enhancement. Torres timely appealed.

## DISCUSSION

Torres argues the prosecutor impermissibly appealed to the jurors' sympathy by urging them to convict Torres "to protect the community." He claims this was improper because it shifted the jury's focus from examining his guilt to improperly comparing the injuries sustained by Torres to those sustained by Finnegan and considering what was right for the community. According to Torres, this was reversible prosecutorial error under federal and state standards.[2] We conclude, however, it was not error under either standard.

We "review[ ] a trial court's ruling on prosecutorial [error] for abuse of discretion." (*People v. Alvarez* (1996) 14 Cal.4th 155, 213.) Under the federal Constitution, a prosecutor who uses "deceptive or reprehensible methods to persuade the jury" commits error which requires reversal when those methods "infect the trial with such "'unfairness as to make the resulting conviction a denial of due process."'" (*People v. Parson* (2008) 44 Cal.4th 332, 359 (*Parson*).) ""Under state law, a prosecutor who uses such methods commits [error] even when those actions do not result in a

---

[2] Although Torres calls it "misconduct," we use the term prosecutorial "error" because "the term prosecutorial 'misconduct' is somewhat of a misnomer to the extent it suggests a prosecutor must act with a culpable state of mind [in order to commit reversible error]." (*People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.)

fundamentally unfair trial" (*ibid.*), but the defendant must show that without the error "'it is reasonably probable that a result more favorable to the defendant would have been reached'" (*People v. Tully* (2012) 54 Cal.4th 952, 1010 (*Tully*)).

Under the federal standard, "[a] prosecutor may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking. The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence. Jurors may be persuaded by such appeals to believe that, by convicting a defendant, they will assist in the solution of some pressing social problem. The amelioration of society's woes is far too heavy a burden for the individual criminal defendant to bear." (*United States v. Leon-Reyes* (9th Cir.1999) 177 F.3d 816, 822 (*Leon-Reyes*).) "On the other hand, a prosecutor may ask the jury to act as a "'conscience of the community'" unless such a request is "'specifically designed to inflame the jury.""" (*Ibid.*) "'[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through a lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.'" (*Id.*, at pp. 822–823.)

Here, the prosecutor told the jury it was "going to speak for the community about whether or not deadly force was reasonable in this situation and whether it was justified or whether it reduced really a cold blooded murder to a manslaughter." He later repeated that the jury "will speak for the community" and, after listening to defense counsel, "will get a chance to go back and make a decision and speak for the community on this case."

These comments were not improper. They did not call on the jury to "protect community values, preserve civil order, [ ] deter future lawbreaking," or solve "some pressing social problem." (*Leon-Reyes*, *supra*, 177 F.3d at p. 822.) The comments simply asked the jury to act as a ""conscience of the community."" (*Ibid.*) This is permissible conduct unless ""specifically designed to inflame the jury""" (*ibid.*) — something we conclude did not happen here.

The result is the same under California law. Our high court has "routinely" upheld comments by the prosecutor that "were tantamount to comparing the jury to "'the conscience of the community""" as proper. (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 789; accord, *People v. Gamache* (2010) 48 Cal.4th 347, 388–389 [rejecting defense objections to "conscience of the community" comments, noting "[j]urors *are* the conscience of the community"]; *People v. Martinez* (2010) 47 Cal.4th 911, 966 [holding prosecutor "properly argued that 'the community, acting on behalf of those injured, has the right to express its values by imposing the severest punishment for the most aggravated crimes'"].)

Even assuming the prosecutor's comments were improper, any error was harmless. To be reversible under federal law, the error must have "infect[ed] the trial with such "'unfairness as to make the resulting conviction a denial of due process.""" (*Parson, supra*, 44 Cal.4th at p. 359.) And under state law, we consider whether "'it is reasonably probable that a result more favorable to the defendant would have been reached'" absent the remarks (*Tully, supra*, 54 Cal.4th at p. 1010) or "whether there is a reasonable likelihood the jury construed the remarks in an improper fashion" (*People v. Steskal* (2021) 11 Cal.5th 332, 350 (*Steskal*)).

9

As noted by the People, the jury could have, but did not, find Torres guilty of first degree murder — thereby undercutting his claim that the comments improperly inflamed one or more jurors.

As for voluntary manslaughter, a theory of "sudden quarrel or heat of passion" has an objective component requiring a defendant's "heat of passion [ ] be due to 'sufficient provocation.'" (*People v. Manriquez* (2005) 37 Cal.4th 547, 584.) The jury was instructed that "[i]f enough time passed between the provocation and the killing for a person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis." (CALCRIM No. 570.) Here, the uncontradicted evidence was that after the fight Torres left for about five minutes, returned with a knife from his apartment, and ran toward Finnegan to stab him in the head.

Voluntary manslaughter under a theory of imperfect self-defense or defense of others requires a person actually but unreasonably believe he must defend himself or another from "'imminent danger of death or great bodily injury.'" (*Steskal, supra*, 11 Cal.5th at p. 345 [imperfect self-defense]; *People v. Trujeque* (2015) 61 Cal.4th 227, 270 [imperfect defense of others].) "'[F]ear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice.'" (*Trujeque*, at p. 270.) Here, the uncontradicted evidence showed Torres's brother and brother-in-law were having a "calm conversation" with C.D. and Finnegan when Torres stabbed Finnegan.

Under these facts, it was not reasonably probable that Torres would have received a verdict more favorable than second degree murder. And because there was ample evidence of malice, that is, Torres's intent to stab Finnegan in the head, we conclude the prosecutor's statements did not

10

seriously "infect the trial with such "'unfairness as to make the resulting conviction a denial of due process.""" (*Parson, supra,* 44 Cal.4th at p. 359; accord, *Leon-Reyes, supra,* 177 F.3d at p. 823.)

## DISPOSITION

The judgment is affirmed.

DELANEY, J.

WE CONCUR:

MOORE, ACTING P. J.

GOODING, J.