Filed 9/4/24  P. v. Stone CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CLARK KENNETH STONE,<br><br>    Defendant and Appellant. | C098174<br><br>(Super. Ct. No. MAN-CR-FE-2020-0012903) |

On November 18, 2020, police officers responded to a 911 call reporting that the 92-year-old victim had died in his sleep in the motel room he shared with defendant Clark Kenneth Stone, the victim's friend and caregiver.  However, a responding officer observed bruising all over the victim's body.  Defendant was charged in connection with the victim's death and a jury found him guilty of murder in the second degree and elder abuse likely to produce great bodily injury or death.  Defendant appeals, asserting that the prosecutor committed prejudicial misconduct in her closing argument by misstating and

diminishing the burden of proof, and that, if he has forfeited this contention, he was denied the effective assistance of counsel. We will affirm.

BACKGROUND

In a second amended information, the prosecution charged defendant with murder (Pen. Code, § 187, subd. (a); count 1)[1] and elder or dependent abuse likely to produce great bodily injury or death (§ 368, subd. (b)(1); count 2). The information further alleged that, in the commission of count 2, defendant proximately caused the death of the 92-year-old victim. (§ 368, subd. (b)(3)(B).)

*The Trial—Relevant Portions of the Prosecution Case*

The victim, who was 92 years old at the time of his death, was defendant's friend and neighbor in Oakland, and, eventually, defendant moved in with the victim. Defendant had been providing care for the victim for years. The victim needed help being fed and with bathing, and he had dementia and would sometimes wander off.

N.S.[2] was defendant's daughter. In 2016, she began to assist with caring for the victim because defendant needed help. In 2018, defendant, the victim, and N.S. moved to Livermore where they all lived together until 2020. N.S. testified she never saw defendant hit the victim, grab the victim aggressively, or physically assault the victim. She also testified defendant could not lift anything heavy with his right hand, and she had not seen him make a fist with his right hand.

In June 2020, N.S., defendant and the victim moved to Lathrop together. A neighbor testified that he had seen the victim with defendant, and that he never saw defendant hit or act aggressively toward the victim. The neighbor testified defendant was "a good guy," and that defendant "always took care of" the victim.

---

[1]     Undesignated section references are to the Penal Code.

[2]     To protect their privacy, we refer to the witnesses by their initials. (Cal. Rules of Court, rule 8.90(b)(10)).

On November 16, 2020, N.S. told defendant he could no longer live at her house. Because the victim would be too much for N.S. to handle in addition to her two jobs and her own family, she told defendant he needed to take the victim with him. Defendant took the victim out of the house on November 17, 2020, at 4:00 or 5:00 p.m. At that time, the victim did not have any injuries or black eyes.

Defendant and the victim, in defendant's minivan, appeared in a surveillance video recorded at a fast food restaurant drive-thru in Tracy on November 17, 2020, at approximately 6:00 p.m. Corporal Eric Smith of the Tracy Police Department testified he did not observe any injuries to the victim in the surveillance video.

At 6:19 p.m., an employee at a motel in Tracy checked defendant into room number 148 (room 148). Soon thereafter, the motel general manager noticed a thin, frail, elderly gentleman with no shoes on and wearing only a diaper and a t–shirt walking away from one of the motel rooms. She did not observe any bruising or bleeding on the man's body. Defendant came out of room 148, placed his hands on the elderly man's shoulders, turned him around, and "directed him back towards [r]oom 148." The manner in which defendant guided the elderly man back to room 148 "didn't seem very caring . . . ." "He was just a little rough" and seemed to be irritated.

During the night of November 17, 2020, motel employees did not receive any complaints about noise coming from room 148, and did not personally hear any fighting, yelling, or screaming.

M.A. (who had been convicted in 2008 of felony perjury) was defendant's girlfriend. They had been together for five or six years. Like N.S., M.A. testified defendant could not open his hand all the way.

On November 18, 2020, defendant and M.A. spoke on the phone and arranged for defendant to pick M.A. up at her house in Antioch. M.A. had been drinking vodka and smoking marijuana that day. On the phone, defendant told M.A. that the victim was at a motel. He also told her that he thought the victim was dead, but M.A. thought defendant

3

was joking. M.A. believed this conversation occurred at about 6:00 p.m. Defendant picked up M.A. and they returned to the motel in Tracy.

M.A. walked into room 148 and saw the victim on one of the beds. He was not moving and was unresponsive. M.A. observed bruising "all over" the victim. M.A. could not detect a pulse. She told defendant to call the police.

Tracy Police Officers Osvaldo Belmonte and Lisette Ortiz were dispatched to the motel at 7:58 p.m. based on a report of a 92-year-old male who had died in his sleep. In the motel room, they saw an elderly male on one of the beds and defendant was attempting to perform CPR. Officer Belmonte felt for a pulse but found the elderly male cold to the touch. He noticed bruising to the elderly male's eyes, swelling to his left eye, and bruising on his neck. Officer Belmonte did not observe any fresh injuries on defendant's hands. A crime scene technician who photographed defendant's hands noticed that defendant could not open his hands all the way.

At 10:30 p.m., defendant requested a different room and to extend his stay. A motel employee remarked that defendant was "laughing . . . it was like giggling." She found his demeanor "weird" under the circumstances. The motel general manager also noted defendant was laughing and joking with a woman about the situation and found his demeanor to be very "off."

M.A. admitted that she lied when she told police that she had never witnessed defendant being physical with the victim. In fact, she had seen defendant act aggressively toward the victim and push him, although she never saw defendant hit the victim. She witnessed such behavior multiple times. This occurred years before the victim's death.

The forensic pathologist who performed the autopsy on the victim testified that the victim had a large bruise on his chest from the area over the left side of his abdomen to his right side by his shoulder. He had five broken ribs on his left side. They "correlate[d] with the impact injuries. So that's inflicted trauma." These injuries could not have

4

resulted from falling and were not consistent with someone performing CPR on the victim. There were two bruises on the victim's right shoulder, bruising on his left side from the hip to his knee, and bruising on his left elbow. He also had a bruise to "the left back of the leg, he clearly got a blow there somehow . . . ." This was not consistent with a fall. The victim's bruising had all occurred recently, within hours. The injuries could have been inflicted by an object or by hand.

The cause of the victim's death, however, was blunt force trauma to the head. The victim had two black eyes. He had a tear on his upper lip suggesting he had been punched across the mouth. He had a bruise on the inner part of his right ear and the right cheekbone and a large bruise on the right side of his jaw. He had similar injuries to the left side. He also had a very large area of bruising on the left side behind his ear. This was not consistent with falling, but rather with being struck. There were no injuries to the victim's nose, forehead, or chin, which the forensic pathologist would expect to see if the victim's injuries resulted from a fall. The victim's injuries indicated his head was struck and jerked from side to side, "like a boxer getting hit," and his brain moved inside his skull. This resulted in a brain hemorrhage on the right side and swelling. At that location, the brain swelling would push down where the spinal cord attaches to the brain, causing respiration to slow. Eventually, this would cause breathing to stop, and the heart would follow. The victim would pass away within five to 15 minutes.

Regarding a prior incident involving defendant, an employee at a hospital in Oakland testified that, on August 8, 2019, she checked defendant in. Later, another employee brought the victim to the desk, and she agreed to help figure out where the victim was supposed to be. Defendant came up and grabbed onto the victim. The employee then heard a moan and saw defendant holding the victim in a headlock and punching him in the stomach at least twice. The employee also saw defendant pull the victim's arm "far back." She called law enforcement.

5

*Relevant Portions of the Defense Case*

Defendant testified that he had known the victim for 46 years. Initially, the victim was his next-door neighbor in Oakland. In 2006, after defendant divorced, he moved in with the victim. After about 10 years, they moved to Livermore where they lived with defendant's daughter, N.S. Next, they all moved to Lathrop.

In 2007, the victim started to experience memory loss and a deterioration in his vision. Defendant went from being the victim's roommate to his caregiver. Initially, that involved preparing food for him and taking him places, but, as time went on, defendant had to bathe the victim and change his clothing.

On November 17, 2020, defendant picked up the victim from N.S.'s house. After defendant got the victim into the minivan, and as defendant continued to load items into the minivan, he saw the victim get out and walk into rose bushes in front of the house. At the time, the victim was wearing pants, and defendant did not notice any injuries to the victim.

Defendant and the victim went to Tracy where they first went to a fast food restaurant. Defendant attempted to enter the restaurant, but they were not admitting customers inside because of the COVID-19 pandemic. When defendant turned back to his minivan, he saw the victim on the ground. The victim "got up and he kind of went back down." Defendant did not observe any injuries to the victim as a result of his fall. Defendant managed to get the victim back into the minivan. Defendant went through the drive-thru and ordered food for both of them. Defendant could not explain why the forensic pathologist would later find no food in the victim's stomach.

Defendant drove to the motel in Tracy and checked in. He went to room 148 while the victim remained in the minivan. When defendant returned to the minivan, he saw the victim wandering around the parking lot with no pants on. Defendant grabbed the victim and "gathered him inside." He then left the victim in room 148 and walked to a nearby convenience store. When he returned, the victim was lying on one of the beds.

Defendant observed some bleeding on the victim's shins. He did not observe any other injuries to the victim. Defendant went to sleep.

The next morning, defendant had errands to run but the victim did not want to go anywhere. Defendant told the victim he was going out. The victim was in bed when defendant left. Defendant went to the front desk and reserved two more nights at the motel.

Defendant ran several errands, including buying a new cell phone in Oakland because he had lost his cell phone at the fast food restaurant. He returned to the motel at 1:00 p.m., after being gone about five hours. The victim was still lying on the bed. Defendant asked if the victim was hungry, but the victim shook his head no. Defendant napped.

At about 3:00 p.m., M.A., defendant's girlfriend, called him, they spoke, and defendant went back to sleep. He woke up again at about 6:00 p.m. He called M.A. and asked her to come stay with him. According to defendant, M.A. lied when she testified that he told her on that phone call that he thought the victim was dead. Defendant drove to Antioch to pick up M.A. The trip to Antioch and back to Tracy took about two hours.

When defendant and M.A. entered the motel room, defendant observed the victim lying on the bed with his mouth open. Defendant called out the victim's name, but he did not respond. Defendant called 911, and the call was played for the jury. In the call, defendant reported that the victim "passed away in his sleep," and also volunteered that the victim had "dementia and, and he falls a lot . . . ." Defendant then performed CPR. He observed that the victim had bruises on his face, eyes, and head, but he did not know how the victim got those bruises.

Defendant testified that he did not hit or punch the victim, grab him aggressively, assault him, or hit him with an object. He had nothing to do with the victim's death. He testified the victim could have sustained his injuries, including the brain injuries, broken ribs, contusions, cuts, and split lip as a result of his fall in the fast food restaurant parking

7

lot.  Defendant acknowledged he was the only person with the victim on November 17, 2020, and that he was "100 percent the only person that had access to him" on that date.

Defendant testified that he could not move his right hand, extend his fingers, make a fist, or pick things up with that hand.  He recalled an incident at a hospital in Oakland in 2019.  The victim had wandered off, so defendant told a woman, "He's with me," and grabbed the victim, turned him around, and walked the other way.  He did not punch the victim or place him in a headlock.

### Rebuttal Testimony

Corporal Smith testified that defendant never told him that the victim fell in a parking lot.  However, he acknowledged that defendant told another detective that the victim slipped at the fast food restaurant.

### Relevant Stipulations

The parties stipulated that a registered nurse from the San Joaquin County jail would testify that she noted a deformity to defendant's right arm/hand with multiple well-healed surgical scars.  The parties also stipulated that Officer Belmonte would testify that, during his discussion with N.S., he asked if the victim had swelling to one of his eyes, and N.S. responded that he did.  Officer Belmonte would have further testified that he asked her "it was because you guys had an argument, correct," to which N.S. responded, "Um, yeah, it . . . Yeah."

### Verdict and Sentencing

On count 1, the jury found defendant not guilty of murder in the first degree, but guilty of murder in the second degree.  On count 2, the jury found defendant guilty of elder abuse likely to produce great bodily injury or death, and found true the enhancement allegation that defendant proximately caused the victim's death.  The trial court sentenced defendant to 15 years to life on count 1, the middle term of three years on count 2, stayed pursuant to section 654, and seven years on the enhancement, also stayed pursuant to section 654.

8

DISCUSSION

I

*Prosecutorial Misconduct Generally and The Parties' Contentions*

" 'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such " 'unfairness as to make the resulting conviction a denial of due process.' " [Citations.] Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial.' " (*People v. Parson* (2008) 44 Cal.4th 332, 359.)

Defendant asserts the prosecutor committed prejudicial misconduct by misstating and diminishing the beyond a reasonable doubt burden of proof. Defendant emphasizes the prosecutor's numerous remarks about reasonableness, and asserts the prosecutor misstated the law by suggesting that reasonableness was the applicable burden and by implying that the beyond a reasonable doubt standard required the " 'jury to determine whether defendant's innocence was reasonable.' "

The People counter that defendant forfeited his prosecutorial misconduct claim. The People further argue that, properly construed, the prosecutor's remarks were "a correct statement of law on evaluating direct and circumstantial evidence, and not a comment on the reasonable doubt standard."

II

*Additional Background*

Following are the portions of the prosecutor's closing argument that defendant challenges on appeal, with the specific remarks challenged appearing in italics. The prosecutor made all of these remarks during her initial closing argument.

The prosecutor told the jury: "There's absolutely no other reasonable–and I want you to remember that word every single time you allow your brain to justify not convicting him of what he did. Reasonableness. You're going to find that through every

9

single instruction you receive.  *What is reasonable?  And that's the burden.  Reasonable.*  Look at that word and remember what it means.  In real language.  It doesn't change just because you walk into a court of law."  (Italics added.)

The prosecutor again raised reasonableness, stating, "So listen to the answers to the questions.  *What is reasonable in light of all of the evidence*?"  (Italics added.)

Later, the prosecutor stated:  "What makes sense in the totality of the information that you received?  When you look at it, . . . what should you see that you don't?  It may seem counterintuitive, but when you look at something and *you go based upon common sense and knowledge and reasonableness, does it change what you're seeing*?  What are the choices borne out by the evidence?"  (Italics added.)

The prosecutor continued:  "So how did we get here?  How did we get from [the victim] in the passenger seat of that [mini]van at [the fast food restaurant] to a slab [i]n the morgue?  It didn't happen in a vacuum.  And it certainly did not happen because he walks through thorn bushes, he takes face plants at the [fast food restaurant], or because he did anything.  *And this is where we're really going to get all back to the reasonableness.*  We only have one person.  One.  The defendant.  Who was 100 percent in the possession of [the victim] during the whole period of time in which he was murdered.  One.  This was not from falling.  This was not from tripping.  This was not old man stuff.  This was not thin skin stuff."  (Italics added.)

The prosecutor then stated:  "*So you have to make sure that you use the reasonable person standard, which again is throughout your instructions, on every single witness*."  (Italics added.)  She continued:  "So what don't you see?  You don't see the actual killing.  But you know what happened.  You listened to what [the forensic pathologist] told you about what happened.  *You are reasonable people who know in life how those things happen.*  So you don't have to see it to know it.  [T]here's one common denominator and the defendant is it.  There's no one else.  And there's nothing else."  (Italics added.)

10

The prosecutor continued:  "So I'm going to ask you this:  You're being asked to believe that [the victim] willfully, on his own, caused all the injuries to himself by these two bushes.  *And this is where we get into reasonableness*, ladies and gentlemen.  This is the culprit of all of the injuries on [the victim's] legs.  But it never happened because the defendant walked him through it to make sure."  (Italics added.)

Discussing the injuries to the victim's legs, the prosecutor urged the jurors to "consider the reasonableness and lack thereof" of defendant's testimony that the victim sustained injuries to his shins from thorns on rose bushes.  Discussing the injuries the victim sustained and the fact that defendant was the only one with him, the prosecutor stated, "[*t*]*his is where we get back to the reasonableness*.  You can only hide for so long until the ligh t just casts down on the truth."  (Italics added.)

The prosecutor continued:  "It was most important to him to go get his girlfriend.  And . . . I just want this to lay there for just a moment, and the reasonableness thereof.  He wants you to believe that he is going to go and get his girlfriend and he's going to bring that girlfriend back to share a motel room with [the victim] in that same room.  I– *reasonableness.  Human reasonableness.*  He brought her for multitudes of reason, but it wasn't to hang out with" the victim.  (Italics added.)

III

*Forfeiture*

To preserve a claim of prosecutorial misconduct, a "defendant must generally object 'in a timely fashion—and on the same ground,' and must 'request[] that the jury be admonished to disregard the impropriety.' " (*People v. Miranda-Guerrero* (2022) 14 Cal.5th 1, 29.)  As defendant acknowledges, he did not object to any portion of the prosecutor's closing argument and he did not request an admonishment.  (*Ibid*.)  Thus, defendant has forfeited his claims of prosecutorial misconduct.

Defendant urges us to reach his claims notwithstanding his forfeiture because his right to due process is at stake.  While we do have the discretion to excuse forfeiture,

11

such discretion is to be exercised sparingly. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.) Moreover, the forfeiture requirement serves an important purpose. Defendants must raise prosecutorial misconduct during trial, where it can be remedied at once in a far more efficient and effective manner than on appeal. (See *People v. Peoples* (2016) 62 Cal.4th 718, 801 [reason for the forfeiture rule is that the trial court should be given the opportunity to correct the misconduct of counsel and thus, if possible, prevent the harmful effect on the minds of the jurors].)

IV

*Ineffective Assistance of Counsel*

Defendant asserts that, if he has forfeited his prosecutorial misconduct claim, as he has, his trial attorney's failure to object to the subject remarks deprived him of the constitutionally effective assistance of counsel.

To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced the defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 691-692; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.) To demonstrate prejudice, a defendant must show a reasonable probability that the defendant would have achieved a more favorable result had counsel's performance not been deficient. (*Strickland, supra*, at pp. 693-694; *Ledesma, supra*, at pp. 217-218.)

The prosecution bears the burden of proving all elements of the crimes charged beyond a reasonable doubt. (*In re Winship* (1970) 397 U.S. 358, 364.) " '[I]t is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its . . . obligation to overcome reasonable doubt on all elements [citation].' " (*People v. Centeno* (2014) 60 Cal.4th 659, 666 (*Centeno*).) "When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable

likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' " (*Id*. at p. 667.)

We agree with the People that, in some of the challenged remarks, the prosecutor was not addressing the beyond a reasonable doubt burden of proof. Instead, in some of her remarks, the prosecutor was urging the jurors, when considering circumstantial evidence, to accept only reasonable conclusions and reject conclusions that were unreasonable. (See *Centeno, supra*, 60 Cal.4th at p. 672 ["It is permissible to argue that the jury may reject impossible or unreasonable interpretations of the evidence and to so characterize a defense theory"]; see also CALCRIM Nos. 224, 225, 226.) But other statements veered into incorrectly suggesting that a "reasonable" account of the evidence would satisfy the state's burden of proof. (*Centeno*, at p. 672.) For example, the prosecution stated: "There's absolutely no other reasonable–and I want you to remember that word every single time you allow your brain to justify not convicting [defendant] of what he did. Reasonableness. You're going to find that through every single instruction you receive. What is reasonable? And that's the burden. Reasonable. Look at that word and remember what it means. In real language. It doesn't change just because you walk into a court of law." In addition, after noting that the prosecution, and not the defense, carried the burden of proof, the prosecution asserted: "[T]he People have no problem standing before you because that burden has been met. The reasonable conclusion to the facts that have been presented to you throughout the whole trial by the People." These statements went beyond urging jurors to reject unreasonable inferences from the evidence and instead diluted the state's burden of proof by suggesting that the jury could render a guilty verdict based on a "reasonable" understanding of the evidence. (*Centeno*, at p. 673.) We do not decide, however, whether defense counsel performed deficiently by failing to object to this line of argument because a court addressing a claim of ineffective assistance of counsel "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant . . . . If it is easier to dispose of

13

an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." (*Strickland v. Washington, supra*, 466 U.S. at p. 697.) We find it more expeditious here to proceed directly to an analysis of prejudice.

To the extent the prosecutor's remarks misstated or diminished the beyond a reasonable doubt burden of proof, substituting for it a reasonableness standard, the prosecutor's remarks contradicted the trial court's instructions. The trial court instructed the jurors, both before and after the presentation of evidence: "A defendant in a criminal case is presumed to be innocent. This presumption requires the People prove a defendant guilty beyond a reasonable doubt. [¶] Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt. Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt, because everything in life is open to some possible or imaginary doubt. [¶] In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the Defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty." (CALCRIM Nos. 103, 220.)

The trial court also instructed the jurors: "You must follow the law as I explain it to you, even if you disagree with it. If you believe the attorneys' comments on the law conflict with my instructions, you must follow my instructions." (CALCRIM No. 200) Additionally, the court provided the jurors with the written jury instructions during deliberations. (See *People v. Cortez* (2016) 63 Cal.4th 101, 133 [rejecting misconduct claim challenging prosecutor's comments on reasonable doubt because, among other factors, the court properly defined reasonable doubt and the jury had written instructions during deliberations that properly defined the standard].) "The jury is presumed to have followed the trial court's instructions in the absence of any indication it was unwilling or unable to do so." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 196.)

14

Defendant principally relies on *Centeno, supra*, 60 Cal.4th 659. In *Centeno*, one of the problems with the prosecutor's argument was that it "strongly implied that the People's burden was met if its theory was 'reasonable' in light of the facts supporting it." (*Id*. at p. 671.) "The prosecutor told the jury that in reaching its decision it must reject impossible and unreasonable inferences, and only consider reasonable possibilities. She stated that 'your decision has to be in the middle. It has to be based on reason. It has to be a reasonable account.' " (*Ibid*.) The Supreme Court stated that it was not a sufficient statement of the standard of proof "that the jury simply believe that a conclusion is reasonable. It must be convinced that all necessary facts have been proven beyond a reasonable doubt." (*Id*. at p. 672.) "The prosecutor, however, left the jury with the impression that so long as her interpretation of the evidence was reasonable, the People had met their burden. The failure of the prosecutor's reasoning is manifest." (*Ibid*.) The Supreme Court stated, "[I]t is error for the prosecutor to suggest that a 'reasonable' account of the evidence *satisfies the prosecutor's burden of proof*." (*Ibid*.) The Court concluded that the prosecutor "confounded the concept of rejecting unreasonable inference with the standard of proof beyond a reasonable doubt. She repeatedly suggested that the jury could *find defendant guilty* based on a 'reasonable' account of the evidence. These remarks clearly diluted the People's burden." (*Id*. at p. 673.) Reversing based on the defendant's ineffective assistance of counsel claim, our Supreme Court concluded: "Given the closeness of the case and the lack of any corrective action, there is a reasonable probability that the prosecutor's argument caused one or more jurors to convict defendant based on a lesser standard than proof beyond a reasonable doubt." (*Id*. at p. 677.)

We distinguish *Centeno* and the effect of potentially improper argument on several grounds. First, the problematic language in *Centeno* did not *alone* diminish the burden of proof, but instead *compounded* the dilution of the burden of proof. The prosecutor in that case also improperly attempted to illustrate the standard of proof by using a visual aid,

15

specifically an outline of the state of California, and asking jurors what state it depicted.[3] (*Centeno, supra*, 60 Cal.4th at p. 670.)

Second, in *Centeno*, the prosecutor's dilution of the burden of proof "came in rebuttal, [and] defense counsel had no opportunity to counter it with argument of his own." (*Centeno, supra*, 60 Cal.4th at p. 676.) Here, because the prosecutor made all of the challenged remarks in her initial closing argument, these remarks were not "the last word on the subject." (*Id*. at p. 677.) Defense counsel had the opportunity to address the beyond a reasonable doubt burden in her closing argument, which she did at some length.

Finally, as the People conceded in *Centeno*, that "was a very close case." (*Centeno, supra*, 60 Cal.4th at p. 677.) Such is not the case here. True, there is no *direct* evidence establishing who inflicted the injuries on the victim that resulted in his death. However, even defendant acknowledged he was the only person with the victim on November 17, 2020, and "100 percent the only person that had access to him" on that date. Defendant picked the victim up from N.S.'s house, at which time he did not have any substantial injuries, and he was with him, alone, the rest of the day. Defendant and the victim drove through a fast food restaurant drive-thru at approximately 6:00 p.m. As seen on a surveillance video of the drive-thru, there were no apparent injuries to the victim. Defendant and the victim then checked into the motel. The motel general

---

**3**     We stated *ante* that the prosecutor's remarks would have contradicted the trial court's instructions, and that the trial court directed the jurors to follow its instructions in the event of such a conflict. (CALCRIM No. 200.) Relying on *Centeno*, defendant suggests the jury would not have known to reject the prosecutor's misrepresentations in favor of the court's instructions. It appears that, in the language on which defendant relies, the Supreme Court was referring to the use of the visual aid and the related hypothetical, not the discussion of reasonableness, when it stated the prosecutor's representations "did not directly contradict the trial court's instruction on proof beyond a reasonable doubt, but instead purported to illustrate that standard," and thus there "was no reason for the jury to reject the prosecutor's hypothetical." (*Centeno, supra*, 60 Cal.4th at p. 676.)

manager saw the victim wandering in the parking lot, wearing only a diaper and a t-shirt, and she saw defendant somewhat roughly steering the victim back into the motel room while seeming irritated.

The next day, defendant spoke to M.A. on the phone at around 6:00 p.m., told her he thought the victim was dead, picked M.A. up in Antioch, and returned with her to the motel. M.A. entered the motel room and found the victim unresponsive, not moving, without a pulse, and with bruises all over his body. When police responded, they found the victim cold to the touch. The forensic pathologist testified about the victim's condition. It is sufficient to say the victim was badly beaten, he had five broken ribs and bruising all over his body, and his injuries were inflicted within hours of the time he was found dead. His injuries could have been inflicted by an object or by hand, but were not consistent with a fall. The injuries to the victim's head indicated his head was struck and jerked from side to side "like a boxer getting hit," his brain moved inside his skull, and he suffered a brain hemorrhage and swelling which pushed down where the spinal cord attaches to the brain, causing respiration to slow and, eventually, to stop. In a 2019 incident at an Oakland hospital, defendant was seen punching the victim at least twice while holding him in a headlock, and M.A. admitted she had previously seen defendant act aggressively toward the victim and push him.

Unlike *Centeno*, this was not a close case. This is so notwithstanding defendant's denials of culpability, his explanation that the victim could have sustained his injuries from a fall, defendant's absence from the motel for several hours, the evidence suggesting he had limited use of his right hand, and that the motel employees did not hear any disturbance from or receive complaints about room 148. Further, the prosecution's case in *Centeno* was problematic in ways not approximated here. In *Centeno*, the "prosecution depended almost entirely" on the credibility of the victim (*Centeno, supra*, 60 Cal.4th at p. 677), who was seven years old at the time of the events at issue and 10 years old at trial (*id*. at pp. 662, 663), and who provided an inconsistent account, initially

17

denied the sexual abuse under oath before reversing course, was unwilling to answer numerous questions, and whose account lacked corroboration (*id.* at pp. 663, 670).

Defendant asserts that "where the jury acquits on some counts, it is reasonably probable that any error was prejudicial as to the other counts." (See, e.g., *People v. Washington* (1958) 163 Cal.App.2d 833, 846 [that the jury requested readbacks of testimony and refused to convict on one count indicates the closeness of the case].) We do not find this premise particularly forceful here. The jury acquitted defendant of first degree murder but found him guilty of second degree murder. Under the circumstances of this case, at most, this could indicate a close case with regard to whether defendant, in murdering the victim, acted willfully, deliberately, and with premeditation. (See § 189, subd. (a); CALCRIM No. 521.) This is borne out by the fact that the jury requested clarification on premeditation.

Defendant similarly relies on the fact that the jury requested a readback of the "pathologist's statement," citing cases in which courts concluded that requests for readbacks indicated uncertainty. (See, e.g., *People v. Woods* (1991) 226 Cal.App.3d 1037, 1052.) However, we are not persuaded that this request establishes that this was a close case generally. At most, it could indicate the case was close on the issue of whether defendant's infliction of the injuries on the victim was accomplished in a way so as to support a finding that the murder was willful, deliberate, and premeditated, not on whether defendant inflicted those injuries.

Defendant also relies on *People v. Ellison* (2011) 196 Cal.App.4th 1342, in which the Court of Appeal concluded the "prosecutor improperly attempted to lessen the People's burden of proof by arguing to the jury that the beyond-reasonable-doubt standard required the jury to determine whether defendant's innocence was reasonable." (*Id.* at p. 1353.) However, in *Ellison*, the court concluded it was not reasonably probable that a result more favorable to the defendant would have been reached in the absence of the error because (1) the jury was properly instructed on the standard of proof, (2) the

18

prosecutor "reminded the jury that '[t]he law comes from the Judge,' " (3) the court gave a curative instruction, and (4) the jury "acquitted defendant of the three most serious charges, demonstrating that it understood the applicable burden of proof . . . ." (*Ibid.*) All but the third factor are represented here as well. Defendant's reliance on *Ellison* is misplaced.

We conclude there is not a reasonable probability defendant would have achieved a more favorable result had his trial counsel objected to the prosecutor's challenged remarks.

DISPOSITION

The judgment is affirmed.

_____\s\_____,
Krause, J.

We concur:

\_\_\_\_\_\s\_____,
Hull, Acting P. J.

\_\_\_\_\_\s\_____,
Feinberg, J.